**MIDWAY MFG. CO., an Illinois corporation, Plaintiff,**

**v.**

**BANDAI–AMERICA, INC., a New Jersey corporation, Bandai Company, Ltd., a Japanese corporation, Bandai Overseas Corporation, a Japanese corporation, Epoch Company Ltd., a New Jersey corporation, Epoch Corporation, a New Jersey corporation, Toys R. US, Inc., a California corporation, Lionel Leisure, Inc., a Pennsylvania corporation, Best Products, Inc., a Virginia corporation, and Lash-Tamaron Distributors, Inc., a New Jersey corporation, Defendants.**

**COLECO INDUSTRIES, INC., a Connecticut corporation, Plaintiff,**

**v.**

**BANDAI–AMERICA, INC., a New Jersey corporation, Bandai Company, Ltd., a Japanese corporation, Bandai Overseas Corporation, a Japanese corporation, Epoch Company Ltd., a Japanese corporation, and Epoch Corporation, a New Jersey corporation, Defendants.**

Civ. A. No. 81–3911.

United States District Court, D. New Jersey.

July 22, 1982.

---

Pitney, Hardin, Kipp & Szuch by Gregory C. Parliman, Morristown, N. J., and Loeb & Loeb by Robert A. Meyer, Los Angeles, Cal., for plaintiff Midway Mfg. Co.

Kaye, Scholer, Fierman, Hays & Handler by Frederic W. Yerman, New York City, for plaintiff Coleco Industries, Inc.

Carella, Byrne, Bain & Gilfillan, New York City by R. Gale Rhodes, Jr., Newark, N. J., for defendants Bandai-America, Inc., Bandai Overseas Corp., Bandai Co., Ltd. and Toys R. US, Inc.

## OPINION

MEANOR, District Judge.

Technological advances and the incessant quest for new forms of leisure time amusement converge in the instant case to thrust this Court into the center of the current video game mania gripping the United States. Specifically, this case involves two of the most popular video games of all time, Pac-Man and Galaxian. Plaintiffs, Midway Manufacturing (Midway) and Coleco Industries (Coleco), manufacture and sell, respectively, the full-size arcade and two of the authorized handheld miniaturized versions of these games. They are suing Bandai Industries (Bandai), a New Jersey corporation importing two other handheld games named Galaxian and Packri Monster. These games are manufactured and exported from Japan respectively by defendants Bandai Company, Ltd. (BL) and Bandai Overseas Corp., (BO). Both of these Japanese corporations are related to Bandai.[1]

Plaintiffs allege that the Bandai handheld games violate the copyright and trademark laws of the United States, as

---

1. Plaintiffs also sue a number of retailers of the Bandai games. These defendants are not directly involved in the instant motions. Epoch Corporation, the other defendant who manufactured and sold another handheld game, has settled with plaintiffs and is no longer in the case. The three Bandai defendants will be referred to collectively as "Bandai" except where discussion focuses solely on one of them.

well as the unfair competition laws of New Jersey and California. Midway in particular charges that the audiovisual displays of the Bandai games infringe its copyright in the audiovisual works of its own arcade games while the names of the Bandai games infringe Midway's trademarks in the names of its arcade machines. Coleco as a licensee of these copyrights and trademarks joins in Midway's allegations of infringements of same. Presently before the court are Midway's motions for summary judgment that:

1. Bandai's Galaxian game infringes Midway's copyrights in its Galaxian game;

2. Bandai's Galaxian game infringes Midway's trademark "Galaxian";

3. Bandai's Packri Monster game infringes Midway's copyright in its Pac-Man game;

4. Bandai's Packri Monster game infringes Midway's trademark "Pac-Man".

In the alternative, Midway requests preliminary injunctive relief on these claims.[2]

### I. Background

Midway is a well-known American producer of video arcade games. Its Galaxian and Pac-Man games were created by Namco, Ltd. (Namco), a Japanese corporation. Both games were first published in Japan by Namco, Galaxian on September 17, 1979 and Pac-Man on May 22, 1980. Midway learned of both games at showings in Japan and determined that they had commercial potential in the United States. Namco and Midway accordingly entered into an agreement whereby Midway would receive all copyright and trademark rights in the two games in both the United States and the rest of the Western Hemisphere. Assignments of the copyright rights in Galaxian and Pac-Man were recorded with the Copy-

right Office on March 6, 1980 and November 13, 1980, respectively. On the strength of these assignments, Midway was issued copyright registrations in its name for both games as audiovisual works, effective the same dates as the assignments were filed.[3]

Midway began marketing Galaxian in the beginning of 1980 and Pac-Man in early 1981. It has promoted these games at considerable expense and they have proved to be two of the most successful video games ever. Although Midway ceased marketing its Galaxian in July 1981, it apparently continues to sell Pac-Man.[4] Midway has actively licensed rights to its two games. As part of a consent judgment, Midway granted Entex Ltd. a limited license, since expired, to produce handheld Pac-Man and Galaxian games. A similar license as to a Galaxian-type game was granted Epoch, originally a defendant here but since dismissed. Tomy Corporation also has a license to produce its own handheld Pac-Man electronic game. This license expires on December 1, 1983 and was part of a quit claim assignment by Tomy to Midway of any rights it might have claimed in the mark Pac-Man as well as in Tomy's mechanical game of the same name. Midway also licensed back Namco, its original assignor of the copyright rights, the rights to the home video versions of the games. Namco has since sublicensed Atari to manufacture such units. Finally, Midway has licensed its co-plaintiff in this suit, Coleco, to produce handheld versions of both Galaxian and Pac-Man bearing those marks. This "semi-exclusive" license is of an indefinite duration and commenced on February 1, 1982. Coleco has been soliciting orders for its games at least since January 1982. Its Pac-Man game was available for retail sale then and its Galaxian game apparently was so available the following month; in

---

2. By order of this court entered February 1, 1982, Bandai has been preliminarily enjoined from selling its Galaxian game under the name "Galaxian" and from selling Packri Monster in packaging highlighting "Pack" and "Mon".

3. Midway has not registered either Pac-Man or Galaxian as its trademark. It claims owner-

ship of both marks by virtue of its prior and continuous use of them in the United States.

4. Indeed, it has recently introduced a new version called Ms. Pac-Man, whose success is reportedly outstripping even that of the original' Pac-Man.

any event, both are now being sold to the public. Coleco has expended large sums in advertising and marketing its handheld games.

Bandai's Packri Monster Game was designed for it by another Japanese company named Kaken. Work on the game apparently began in October 1980; it was first produced for distribution in April or May 1981. BL created its Galaxian game in Japan apparently during early 1980. BL sells these games to BO; BO sells them, in Japan, to Bandai which, in turn, actually imports them into the United States. Bandai has been selling Galaxian units in the United States since late 1980 and Packri Monster Games since July 1981.

Midway's Arcade games cost several thousand dollars and are sold primarily to arcades, bars, and similar establishments. Bandai's games sell for approximately $30–$50 and are retailed to the general public mainly through toy stores.

## II. *The Games*

At the heart of a copyright infringement action are the works themselves. Since audiovisual works are at issue here, extensive visual and aural examinations have been undertaken. A description of the various games is thus in order.[5]

A. *Midway's Pac-Man*: The Seventh Circuit in the recent case of *Atari v. North American Philips Consumer Electronics Corp.*, 672 F.2d 607 (7th Cir. 1982) had before it an infringement action involving the very same Midway Pac-Man game as is at issue here. The following description, which this court adopts, may be found at 672 F.2d 610–611:

> The copyrighted version of PAC–MAN is an electronic arcade maze-chase game. Very basically, the game "board," which appears on a television-like screen, consists of a fixed maze, a central character (expressed as a "gobbler"), four pursuit characters (expressed as "ghost monsters"), several hundred evenly spaced pink dots which line the pathways of the maze, four enlarged pink dots ("power capsules") approximately located in each of the maze's four corners, and various colored fruit symbols which appear [intermittently] near the middle of the maze during the play of the game.

> Using a "joy stick," the player guides the gobbler through the maze, consuming pink dots along the way. The monsters, which roam independently within the maze, chase the gobbler. Each play ends when a monster catches the gobbler, and after three plays, the game is over. If the gobbler consumes a power capsule, the roles reverse temporarily: the gobbler turns into the hunter, and the monsters become vulnerable. The object of the game is to score as many points as possible by gobbling dots, power capsules, fruit symbols, and monsters.

> The PAC–MAN maze has a slightly vertical rectangular shape, and its geometric configuration is drawn in bright blue double lines. Centrally located on the left and right side of the maze is a tunnel opening. To evade capture by a pursuing monster, the player can cause the central character to exit through one opening and re-enter through the other on the opposite side. In video game parlance this concept is called a "wraparound." In the middle is a rectangular box ("corral") which has a small opening on the upper side. A scoring table, located across the top of the maze, displays in white the first player's score on the left, the high score to date in the middle, and the second player's score on the right. If a player successfully consumes all of the dots, the entire maze flashes alternately blue and white in victory, and a new maze, replenished with dots, appears on the screen. When the game ends a

---

**5.** Although other full-size configurations exist, the Pac-Man game is usually housed in an upright cabinet approximately 6′ × 2′ × 2′. Midway has provided the Court with one Pac-Man and one Galaxian arcade machine. In addition, Midway has furnished official copies of the videotapes of these machines deposited with the Copyright Office, as per that Office's requirements. These videotapes have been viewed by the court. Bandai and Coleco have both also furnished the Court with samples of their games.

bright red "game over" sign appears below the corral.

At the start of the game, the gobbler character is located centrally near the bottom of the maze. That figure is expressed as a simple yellow dot, somewhat larger than the power capsules, with a V-shaped aperture which opens and closes in mechanical fashion like a mouth as it travels the maze. Distinctive "gobbling" noises accompany this action. If fate (or a slight miscalculation) causes the gobbler to fall prey to one of the monsters, the action freezes, and the gobbler is deflated, folding back on itself, making a sympathetic whining sound, and disappearing with a star-burst.

The four monster characters are identical except that one is red, one blue, one turquoise, and one orange. They are about equal in size to the gobbler, but are shaped like bell jars. The bottom of each figure is contoured to stimulate [sic] three short appendages which move as the monster travels about the maze. Their most distinctive feature is their highly animated eyes, which appear as large white circles with blue irises and which "look" in the direction the monster is moving. At the start of each play, the monsters are located side-by-side in the corral, bouncing back and forth until each leaves through the opening. Unlike the gobbler, they do not consume the dots, but move in a prearranged pattern about the maze at a speed approximately equal to that of the gobbler. When the gobbler consumes a power capsule and the roles reverse, the monsters panic: a siren-like alarm sounds, they turn blue, their eyes contract into small pink dots, a wrinkled "mouth" appears, and they immediately reverse direction (moving at a reduced speed). When this period of vulnerability is about to end, the monsters warn the player by flashing alternately blue and white before returning to their original colors. But if a monster is caught during this time, its body disappears, and its original eyes reappear and race back to the corral. Once in the corral, the monster quickly regenerates and reenters the maze to resume its pursuit of the gobbler.

Throughout the play of PAC–MAN, a variety of distinctive musical sounds comprise the audio component of the game. Those sounds coincide with the various character movements and events occurring during the game and add to the excitement of the play.

To the foregoing account, this court would add that when, in the same game, the board is cleared of dots twice, five times, nine times, thirteen times, and possibly various times thereafter, the play action ceases and the player loses control of the machine. During this brief interlude of perhaps five to ten seconds, there appears on the screen a cartoon sequence. The first cartoon sequence depicts the central character (generally referred to as the Pac-Man) beating a hasty retreat from right to left across the screen while being pursued by one of the ghost figures. They disappear very briefly from the left side of the screen and then reappear, their roles reversed, with an enlarged Pac-Man pursuing from left to right a ghost in its vulnerable blue mode. During this entire sequence, a distinctive theme song plays. This first sequence is the most relevant for reasons which will be discussed below.[6]

B. *Bandai's Packri-Monster*: Bandai's Packri-Monster game is housed in a silver-grey rectangular plastic box measuring approximately $8'' \times 4'' \times 1''$. The display screen is at the upper right of this box and

6. The second sequence follows the same initial format as the first except that one-half way across the screen while the ghost is pursuing the Pac-Man, the ghost's apparel or garment becomes caught on a tack. The ghost stops and looks forlornly at his garment as a section of it tears away, revealing a flesh-colored leg. The sequence then ends. The third sequence—which is repeated each time a break in the action is achieved thereafter—is more like the first than the second. A ghost in an obviously resewn garment chases Pac-Man to the left of the screen. The ghost then reappears, although the Pac-Man does not, fleeing from left to right in a virtually denuded state, displaying an ignominious physiognomy, and dragging behind it its battered robe.

is approximately 1½″ × 4″. The player controls the action of the game via a small black plastic joystick at the lower right-hand of the game.

The maze itself is somewhat smaller than the display screen. Its configuration is less complex than that of Midway's Pac-Man. Rather than being projected by light, the outline of the maze is embossed in white on the transparent plastic panel covering the light-emitting surface of the game. At the top center of the maze is a rectangle with the word "score" above it, both similarly embossed in white. At the bottom left and right of the maze are openings, both marked "warp". In the center of the maze is another rectangle with an opening at the top, denominated by the game's package as the "bogey room". At the left of the maze are two more rectangles, one atop the other, open on the left side.

When the machine is turned on, 37 small green solid ovals and two red ones appear on the playing field, the two red dots at the top left and right of the screen. Directly below the bogey room there appears a larger blue outline of an oval with what appear to be two small bulges in the top of it at left and right, approximating eyes. The bottom center portion of this oval has two breaks in the outline, thus suggesting a jaw or mandible. Bandai calls this depiction the "monster". There are three monsters per game. The player's remaining monsters appear at the left of the maze, one each in the two rectangles described above. In the bogey room there appears a red outline of a lone bell jar shaped creature with two short horns or antennae protruding from its top. At the bottom is a wavy line suggestive of feet or other appendages. This "bogey" as Bandai denominates it, is larger than the monster. Until the player begins the game, the bogey first moves from side-to-side in its room, then emerges from same and roams according to a predetermined pattern in an attract mode. It does not consume the dots.

Once the player starts the Bandai game, he can move the monster to the left and right and up and down by manipulating the joystick. As the monster moves, its jaw disappears and reappears, creating the illusion of an opening and closing mouth. As the monster passes over the dots in the maze, they disappear. Thus, the illusion is created of the monster eating or consuming the dots. As each dot disappears, a short tone is heard.

As the game is played, the bogey moves about the maze, at times appearing to move randomly, at times seeming doggedly to pursue the monster. If the bogey overtakes the monster in the ordinary course of play, a musical tone sounds, the monster appears, flashing, within the bogey for a second or two, and both disappear. The next monster then appears at the start position and the bogey resumes its initial position in the bogey room. If the monster consumes one of the two red dots, the bogey then becomes vulnerable to the monster's depredations. This is signified by the appearance of the outline of the monster within the bogey. At this point, if the player is successful in overtaking the bogey, a few musical notes are heard and the bogey disappears, reappearing a few seconds later in the room from which it then reemerges. When the bogey's vulnerability is about to end, the player is warned by the flashing of the monster's outline within the bogey. During the game, the player may escape pursuing bogeys by utilizing the exits marked "warp", leaving through one and entering through the other.

If a player succeeds in clearing the board of all its dots, a few musical notes are heard and a new board appears. When the second board appears, *two* bogeys are in the room. On the third and all subsequent boards, there are three bogeys.

After clearing the second, fourth and presumably every even-numbered board after that, the player is rewarded with monetary loss of control of the machine during which a cartoon sequence appears. This sequence consists of a bogey chasing from the right to left side of the screen a monster. When they reach the left side of the screen, their roles reverse and the monster pursues the vulnerable (signified by the presence of a

monster within the bogey) bogey from the left to right of the screen. A musical theme plays during this entire interlude.

It should be noted that the technology underlying the visual displays of the arcade and handheld games differs. The arcade games employ what are essentially television tubes and thus embody a high degree of clarity and detail of image. Like ordinary televisions, the arcade games achieve smooth and realistic depiction of the characters in motion by virtue of a steady stream of electrons striking the screen. The handheld games utilize light sources which appear similar to those found in calculators and digital watches. The display screens of the handheld games are composed of certain preexisting images which are lighted in sequence to achieve the illusion of motion. Thus, the handheld games present much cruder and more jerky images to the player.

C. *Midway's Galaxian Game*: Midway's Galaxian is housed in an arcade cabinet identical in size and shape to Pac-Man's; only the coloring and decoration are different. The game is similarly played on a large cathode ray tube (CRT). Galaxian's joystick moves only left and right and there is an additional button on the console which the player uses to fire his missiles or bullets.

Like Pac-Man, Galaxian has an attract mode, displayed before the insertion of a quarter, which repeats endlessly the same pattern of movements by the game's figures across the screen. During the attract mode or once the player has commenced a game, there appears a black background simulating outer space against which there plays a multi-color twinkling display of lights representing stars that appear to roll from the top to the bottom of the screen.

Against this background there is visible a pack of creatures representing aliens flying in formation. All but two of these are insectile things (resembling houseflies), all with the same basic configuration but differently colored wings and bodies. All flap their wings and move their legs as they hover. At the bottom of the pack are three rows of ten each red-eyed, blue-bodied insects. Above them is one row of eight red-eyed, purple-bodied things and above that, one row of six yellow-eyed, red-bodied entities. All the insects have blue wings of various shades as well as two antennae and two forelegs. At the top of the pack are two predominately yellow, vaguely triangular geometric shapes with protruding shafts, known as the "flag ships". This pack moves as a whole horizontally during the attack and play modes, apparently in response to similar movements by the player's rocket ship. That ship appears at the bottom of the screen as having two cylindrical parts joined by a red top and a "V"-shaped brace with a thinner central cylinder between them. Protruding from the red top is a short yellow line which, when the player hits the fire button, shoots upward as a small missile. A new line appears when the one fired meets an alien or disappears at the top of the screen. The player can move his rocket ship horizontally but not vertically.

During play, both single aliens and groups of them will invert and swoop down toward the player's ship, attacking in waves. Moving across the screen, the marauding aliens drop a profusion of bombs. If the player's ship is hit, it disappears in a visual simulation of an explosion as will an alien if hit by a player's missile. Additionally, the player's ship will be destroyed if it collides with an alien; the aliens, kamikaze-like, attempt to effect just such collisions. As in Pac-Man, the player has three figures at his disposal; also as in Pac-Man, a fourth is awarded for achieving a sufficiently high score. Appropriate screaming dive and explosion sounds accompany the action.

D. *Bandai's Galaxian Game*: The Bandai Galaxian is contained in a blue plastic unit which can roughly be described as triangular with one apex slanted upward at approximately a 45° angle to the other two apexes which lie flat. Its greatest width is approximately 7″, length 9″, and height 5″.

The playing screen is approximately 1¼″ × 3″ with a score display above it. As with Bandai's Packri Monster, the impression created by the lighting used is akin to that of an LED watch or calculator rather than a CRT.

There is no attract mode in Bandai's Galaxian. When switched on, the machine goes directly into the play mode. There is a fire button but rather than a joystick, there are two buttons which move the player's spacecraft either right or left. When turned on, the screen displays six clearly insectile creatures hovering at the top of the screen. As they hover, these aliens have blue wings and forelegs with red eyes and bodies. When they descend to attack, they invert and their wing/foreleg color changes to green, their eyes and body remaining red. As they attack, they move both horizontally and vertically and appear to flap their wings.[7] The aliens both drop bombs and attempt to collide with the player's ship. Against the black background of the game there appear red twinkling dots, simulating stars. These flash on and off in such a fashion as to create the illusion that they are moving from the top to the bottom of the screen.

At the bottom of the screen is the player's ship. It can be moved horizontally and fires red missiles which protrude from the nose of the ship. The ship appears as three green cylinders joined together, two larger ones flanking a smaller one. A player is allotted five ships; those in reserve are displayed at the top of the screen above the aliens.

### III. Copyright Infringement Claims

██ A. *Applicable Copyright Law*: Summarizing the basic law germane to a copyright infringement claim is often much easier than applying it. In brief, a plaintiff must show ownership of a valid copyright and copying by the defendant. *Atari, Inc. v. North American*, 672 F.2d 607, 614 (7th Cir. 1982); *Franklin Mint Corporation v. National Wildlife Art Exchange, Inc.*, 575 F.2d 62, 64 (3d Cir.), *cert. denied*, 439 U.S. 880, 99 S.Ct. 217, 58 L.Ed.2d 193 (1978). Because copying is often difficult to prove directly, it may be inferred from a showing that a defendant had access to the copyrighted work and that the allegedly infringing work is substantially similar to the copyrighted work. *Franklin Mint*, 575 F.2d at 64. As cast by this Circuit at least, this basic copyright infringement case entails a two-pronged showing: (1) that defendant has copied the plaintiff's work and (2) that there is a substantial similarity between the two works, i.e., that "the copying went so far as to constitute improper appropriation." *Universal Athletic Sales Co. v. Salkeld*, 511 F.2d 904, 907 (3d Cir.), *cert. denied*, 423 U.S. 863, 96 S.Ct. 122, 46 L.Ed.2d 92 (1975); *Franklin Mint*, 575 F.2d 62, 65. Substantial similarity is the test for each prong, *Universal Athletic*, 511 F.2d at 907, but as the Third Circuit has stated, "substantial similarity is not always substantial similarity". *Id.* The chief difference between the two forms of substantial similarity appears to be the type of inquiry permissible as to each. Dissection (i.e., a detailed analysis of the two works) and expert testimony are proper in establishing substantial similarity to show copying and access. *Id.* When attempting to demonstrate improper appropriation via the second form of substantial similarity, however, dissection and expert testimony are irrelevant; rather than a detailed analysis of the work, the court should "record [its] impressions as they would appear to a layman viewing the [works] side by side ... [and] concentrate upon the gross features rather than an examination of minutiae... The more the court is led into the finer points of the [works], the less likely it is to stand upon the firmer, if more naive, ground of its considered impression after its own perusal." *Id.* at 908–09.

In the *Universal Athletic* case, the Third Circuit was dealing solely with the type of substantial similarity which goes to the appropriation issue since it accepted the district court's finding that there had been copying. *Id.* at 907. The Third Circuit noted that it was "difficult to explain all the points of similarity and dissimilarity between the [works] without going into great detail." *Id.* at 908. Presumably, going into such detail would be impermissible

---

7. This illusion of wing-flapping is created by lighting in rapid succession images of the aliens in different postures, i.e., with wings open and closed.

on this branch of the substantial similarity inquiry. This quote and the one above perhaps indicate the Third Circuit's awareness that its decision puts a trial court in the very delicate position of having to identify sufficiently similarities between two works to justify a finding of appropriation without simultaneously making the identification impermissibly detailed so as to constitute forbidden "dissection". Perhaps the Third Circuit's teaching in this connection is simply, as it states, that a court should focus upon the gross features rather than examine minutiae when determining substantial similarity for appropriation purposes. This court will proceed on the assumption that this is the ultimate meaning of the *Universal Athletic* case and will attempt to walk the fine line between the permissible and impermissible in its comparison of the works before it.[8] The delicacy of this inquiry is compounded by the fact that, as numerous courts have observed, determinations of copyright infringement are largely made on an *ad hoc* basis, the test for infringement necessarily being vague and seemingly arbitrary. *E.g., Universal Athletic*, 511 F.2d at 907.

■■■ It is clear that there can be substantial similarity and copyright infringement between works in different media. *Atari*, 672 F.2d at 618 n.12; 2 M. Nimmer, Nimmer on Copyright ("Nimmer") § 8.01[C], p. 8–13 (1981). It is also unquestionable that video games in general are entitled to copyright protections as audiovisual works. *Atari*, 672 F.2d at 615, 617–18; *Stern Electronics, Inc. v. Kaufman*, 669 F.2d 852, 856–57 (2d Cir. 1982).

■■■ Copyright certificates produced by a plaintiff constitute *prima facie* evidence of both copyright validity and ownership. *Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*, 558 F.2d 1090, 1092 n.1 (2d Cir. 1977). One element of copyright validity is the originality of the work; a certificate provides *prima facie* evidence of such originality. *Stratchborneo v. Arc Music Corp.*, 357 F.Supp. 1393, 1399 n.6 (S.D.N.Y. 1973). This *prima facie* presumption of validity and ownership is rebuttable; where evidence in the record casts doubt on the issue, there is no assumption of validity. *Durham Industries, Inc. v. Tomy Corporation*, 630 F.2d 905, 908 (2d Cir. 1980). A defendant may rebut the *prima facie* effect of a copyright registration by producing evidence that the copyrighted work was itself copied from another work, *Russ Berrie & Co., Inc. v. Jerry Elsner Co.*, 482 F.Supp. 980, 987 (S.D.N.Y.1980), thus challenging the originality of plaintiff's work. Upon proof by a defendant that a plaintiff had access to similar prior works, the burden of proving originality shifts back to plaintiff. *M. M. Business Forms Corporation v. Uarco, Incorporated*, 347 F.Supp. 419, 425 (S.D.Ohio 1972), *aff'd* 472 F.2d 1137 (6th Cir. 1973). It is apparently the court's responsibility on a preliminary injunction motion as well as in a bench trial to deter-

---

8. It should be noted, however, that the *Universal Athletic* court set forth other issues to be considered in resolving the question of substantial similarity for appropriation purposes. These include the well-known idea-expression dichotomy in copyright law and the observation that the test of similarity vis-a-vis appropriation will vary with the degree of creativity involved in the copyrighted work, the nature of the protected material, and the setting in which it appears. *Id.* at 908. Indeed, although the Third Circuit stated that the district court had been impermissibly detailed in its substantial similarity comparison, the actual basis for reversal appears to be set forth at 511 F.2d 909. There, the Third Circuit noted that the similar elements of the works before it involved only a minimal amount of creativity and were necessarily similar because expressive of the same simple ideas. *Id.* Thus, a lay observer could not conclude that similarity between them was such as to amount to an appropriation of plaintiff's work. *Id.* Accordingly, it is quite plausible that the *Universal Athletic* case actually stands for the proposition that similarity for copying purposes turns simply on the physical characteristics of the work while similarity for appropriation purposes must take into account, *inter alia*, the factors listed by the Third Circuit in determining the extent or degree of the copying. In any event, this court will, in its consideration of similarity for appropriation purposes, take into account such Third Circuit factors and others which are pertinent. Finally, it should be noted that *Universal Athletic*'s treatment of substantial similarity was quoted with approval in *Franklin Mint*, 575 F.2d 62, 65–66.

mine whether a copyright registration has been successfully rebutted. *Russ Berrie*, 482 F.Supp. 980, 987. To show a lack of originality and thereby rebut a plaintiff's registration certificate, a defendant should, in the absence of direct proof of copying, make the same showing of copying by *plaintiff* required in a *prima facie* infringement case, *i.e.*, access and substantial similarity as between plaintiff's work and that from which it was allegedly copied. 3 Nimmer § 12.11[A], p. 12–75–78 & n.15. It is clear that, subject to the discussion below of the law regarding summary judgment in copyright cases, the issue of copying and thus the subsidiary issues of access and substantial similarity are questions for the trier of fact. *Novelty Textile*, 558 F.2d 1090, 1093 n.2; 3 Nimmer § 13.01[B], p. 13–5–6. Thus, a court would not be justified in finding that a registration certificate has been rebutted as *prima facie* evidence of originality unless either the court was sitting as the trier of fact or it found as a matter of law that the similarities between the plaintiff's work and the allegedly preexisting work were so great as to mandate, in the absence of other evidence from plaintiff, a finding of copying by plaintiff. In short, since originality is a requirement of a copyright, a finding that a defendant has rebutted a certificate by showing plaintiff's lack of originality in his work is tantamount to judgment for defendant, at least in the absence of other evidence proving plaintiff's originality.[9] A court such as this, asked to entertain alternative motions for summary judgment or for a preliminary injunction, should thus determine whether a certificate has been rebutted as to originality by the standards applicable for summary judgment in a copyright case. If such standards have not been met by either party, the court cannot decide the rebuttal question and should only express its belief in the likelihood that either would prevail on the originality issue at a hearing before the trier of fact. In sum, an argument that a certificate has been rebutted by virtue of plaintiff's lack of originality is inseparable from the argument that a plaintiff has failed to prove his case and thus should be treated accordingly.[10] A similar approach must be taken to an argument that a registration is invalid because a plaintiff failed to disclose preexisting works in his application for copyright registration. *See, e.g., Russ Berrie*, 482 F.Supp. at 987–88. This follows from the fact that such a failure to disclose logically presupposes the same elements—plaintiff's access to a work from which he copied—as does a rebuttal of a registration based on plaintiff's lack of originality. It is only common sense that a registration cannot be invalidated for failing to disclose preexisting works if those works are not in fact substantially similar to the copyrighted work and plaintiff did not copy them.

**9.** A plaintiff in this position who demonstrates that although he has indeed copied, he has added some original elements to the work, will be entitled to copyright protection as to those elements. *Donald v. Zack Meyer's T.V. Sales and Service*, 426 F.2d 1027, 1029 (5th Cir. 1970), *cert. denied*, 400 U.S. 992, 91 S.Ct. 459, 27 L.Ed.2d 441 (1971).

**10.** Treatment of the rebuttal question in other cases supports this court's approach. Thus, the issue usually arises in suits where the trial court is sitting as the trier of fact and accordingly may properly decide the issues underlying the rebuttal question. *See, e.g., Original Appalachian Artworks v. Toy Loft*, 489 F.Supp. 174, 178–79 (N.D.Ga.1980). In a preliminary injunction motion case, a court found that a defendant had successfully rebutted the *prima facie* effect of plaintiff's registration where plaintiff's work displayed a "striking similari-ty" to the preexisting work and the plaintiff admitted having seen and copied (with minor variations) the preexisting work. *Russ Berrie*, 482 F.Supp. 980, 983, 987–88. It is noteworthy that "striking similarity" is the standard for finding copying and infringement even in the absence of proof of access. 3 Nimmer § 13.-02[B], p. 13–13–14. Indeed, the *Russ Berrie* court went on to grant defendant summary judgment after denying plaintiff a preliminary injunction. *Russ Berrie*, 482 F.Supp. at 989. Similarly, in a summary judgment case, a court found a certificate rebutted where the plaintiff had claimed a copyright for its licensed, three-dimensional figures of three instantly recognizable cartoon characters (Disney's Mickey Mouse, Donald Duck, and Pluto Dog) because, on their face, they lacked utterly any degree of originality. *Durham Industries*, 630 F.2d at 908–11.

Summary judgment, including judgment for the plaintiff, is permissible in a copyright case. *Knickerbocker Toy Co., Inc. v. Genie Toys Inc.*, 491 F.Supp. 526 (E.D.Mo.1980); *Leeds Music Limited v. Robin*, 358 F.Supp. 650, 653 (S.D.Ohio 1973).[11] Summary judgment should not be granted a copyright litigant where the position of the party opposing the motion would be supported at trial by substantial evidence. *Knickerbocker Toy*, 491 F.Supp. at 528. Substantial evidence must be such that a reasonable mind would accept it as sufficient to support a conclusion; it must suffice to justify a denial of a directed verdict for the movant at the close of a jury trial. *Id.* Put otherwise, a court should grant a copyright litigant summary judgment where substantial similarity is in issue only if it would be required at trial to direct a verdict for the moving party. *McMahon v. Prentice-Hall, Inc.*, 486 F.Supp. 1296, 1301 (E.D.Mo.1980). *See O'Neill v. Dell Publishing Co., Inc.*, 630 F.2d 685, 687 (1st Cir. 1980). Where the only facts relevant to the substantial similarity question—the two works—are before a court and not in dispute, the directed verdict issue can be resolved in a summary judgment motion before trial. *McMahon*, 486 F.Supp. at 1301. On Midway's motion here for summary judgment, the question is thus whether this court would be bound to direct a verdict for Midway at trial, i.e., whether this court can rule that no reasonable jury could find a lack of substantial similarity between the Midway and Bandai works.

Under F.R.Civ.P. 56(d), a district court may render a partial summary adjudication withdrawing from a copyright case issues as to which there is no genuine question of fact. *Testa v. Janssen*, 492 F.Supp. 198, 204 (W.D.Pa.1980). In *Testa*, plaintiff failed to furnish sufficient evidence, even of a circumstantial nature, directly suggesting access by defendants. *Id.* at 203–04. Accordingly, the court held that as a matter of law, proof of access was lacking. *Id.* Plaintiff was thus precluded at trial from directly asserting that defendants had access.[12] *Id.* at 204.

It should be noted that there is absolutely no impediment in a copyright infringement action to granting a plaintiff a preliminary injunction while simultaneously denying his motion for summary judgment. *Herbert Rosenthal Jewelry Corp. v. Grossbardt*, 428 F.2d 551, 554 (2d Cir. 1970). Acknowledgement that disputed fact issues exist does not preclude a court from granting a plaintiff preliminary relief. *Id.* Similarly, the existence of a plausible defense in a copyright case is no barrier to the issuance of a preliminary injunction as long as the movant shows a substantial likelihood of success on the merits. *Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.*, 600 F.2d 1184, 1188 (5th Cir. 1979).

In general, a copyright plaintiff seeking a preliminary injunction must establish a reasonable likelihood of success on the merits and a showing of irreparable injury absent an injunction. *Kontes Glass Co. v. Lab Glass Inc.*, 373 F.2d 319, 320–21 (3d Cir. 1967). Additional factors to be considered by a district court in exercising its discretion are the balance of hardships between the parties and whether the public interest would be served by issuing a pre-

---

11. Nimmer notes that in general, a copyright plaintiff should be granted summary judgment only where a defense consists exclusively of issues of law as to which the court finds in plaintiff's favor. 3 Nimmer § 12.10, p. 12–73– 74. Where, as here, a defendant has denied copying, a plaintiff should be granted summary judgment only in "very unusual circumstances" such as where similarities between the works are so "overwhelming and pervasive" as to preclude independent creation. *Id.* In that case, a defendant's denial of copying would not raise a genuine fact issue. *Id.* Nimmer states that the similarity required in such a case should "greatly exceed even the striking similarity which would justify a trier of fact in inferring copying without proof of access." *Id.*

12. The court specifically ruled, however, that plaintiffs could still prove access *indirectly* by showing a striking similarity between the works in question so that access would be inferred from that similarity. *Id.* This mode of proof of a plaintiff's case is widely accepted. *See* note 10 *supra.*

liminary injunction. *Atari*, 672 F.2d 607, 618; *Klitzner Industries, Inc. v. H. K. James & Co.*, 535 F.Supp. 1249, 1253 (E.D. Pa.1982). The trend of the law in preliminary injunction cases involving copyright infringement appears to be that, upon a showing of likelihood of success on the merits, irreparable injury to the plaintiff will be presumed. At a minimum, the Second and Seventh Circuits have adopted such an approach. *Wainwright Securities Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91, 94 (2d Cir. 1977), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978); *Atari*, 672 F.2d 607, 620 (7th Cir. 1982); *see generally* 3 Nimmer § 14.06[A], pp. 14–50 & n. 16. The presumption of irreparable injury has also been applied by a number of district courts. *See, e.g., Northwestern Bell Telephone Co. v. Bedco of Minnesota, Inc.*, 501 F.Supp. 299, 303 (D.Minn.1980); *Metro-Goldwyn-Mayer, Inc. v. Showcase Atlanta Cooperative Productions, Inc.*, 479 F.Supp. 351, 362 (N.D.Ga.1979); *Neal v. Glickman*, 391 F.Supp. 1088, 1089 (N.D.Texas 1975); *Walt Disney Productions v. Air Pirates*, 345 F.Supp. 108, 110 (N.D.Cal.1972), *aff'd in part and rev'd in part on other grounds*, 581 F.2d 751 (9th Cir. 1978), *cert. denied*, 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 94 (1979). Closer to home, a string of Pennsylvania district court cases has adopted the presumption. *See, e.g., Klitzner Industries*, 535 F.Supp. at 1258–59; *Custom Decor, Inc. v. Nautical Crafts, Inc.*, 502 F.Supp. 154, 157 (E.D.Pa.1980); *Triangle Publications, Inc. v. Sports Eye, Inc.*, 415 F.Supp. 682, 684–85 (E.D.Pa.1976); *Universal Athletic Sales Co. v. Salkeld*, 340 F.Supp. 899, 902 (W.D.Pa.1972), *rev'd on other grounds*, 511 F.2d 904 (3d Cir.), *cert. denied*, 423 U.S. 863, 96 S.Ct. 122, 46 L.Ed.2d 92 (1975). The Third Circuit has not specifically passed on the practice of presuming irreparable injury in a copyright case where a preliminary injunction is requested. *Kontes*, the case most nearly on point in this Circuit, is ambiguous with regard to the question and certainly cannot be said to preclude adoption of the presumption.[13] In *Kontes*, the Third Circuit did state that a showing of irreparable injury is an essential prerequisite to preliminary injunctive relief and concurred in the district court's finding that plaintiff had failed to make such a showing. 373 F.2d at 320. Despite characterizing irreparable injury as an essential prerequisite to an injunction, the *Kontes* court nonetheless went on to discuss the second requirement of whether the plaintiff had shown a likelihood of success on the merits. *Id.* at 320–21. The court's consideration of this second factor implies that, at least under some circumstances, a sufficient showing of likelihood of success on the merits would by itself suffice to obtain injunctive relief. Such an interpretation is buttressed by the court's stating that a plaintiff must show a "*reasonable* likelihood" that he will succeed on the merits and then noting that here, there was not "that *strong* likelihood of success which in the circumstances of this case [presumably, a failure to show irreparable injury] would *alone* justify" granting plaintiff a preliminary injunction. *Id.* (emphasis added). Indeed, the *Kontes* court explicitly stated that "[Likelihood of success] is of particular importance where, as here, there is only slight evidence on the question of irreparable injury." *Id.* at 320. This statement would, at a minimum, suggest that the strength of a showing of irreparable injury required of a plaintiff varies inversely with the strength of his showing of a likelihood of success on the merits. In sum, the ambiguous *Kontes* case does not mandate the rejection of the irreparable injury presumption; indeed, it is quite arguable that the *Kontes* case supports such a presumption. Although this court adopts the presumption, it will not rely solely upon it in this case but will also examine plaintiff's showing of irreparable injury.

■ The final area of copyright law to be set forth generally for purposes of this case is that regarding unenforceability of a copyright due to a registrant's fraud upon the Copyright Office in failing to disclose preexisting works. To render a registration

---

**13.** In this connection, *see Universal Athletic*, 340 F.Supp. at 902.

invalid and incapable of supporting an infringement action on these grounds, however, the failure to disclose must be knowing or intentional. *Russ Berrie*, 482 F.Supp. at 987–89; *Vogue Ring Creations, Inc. v. Hardman*, 410 F.Supp. 609, 614–17 & n.2 (D.R.I.1976). Furthermore it appears that a misrepresentation in a copyright application must harm or prejudice a defendant in some way or affect the validity of the copyright. *Testa*, 492 F.Supp. 198, 201. The *Testa* court held that a false claim of authorship of copyright comprised no bar to an infringement action where, in any event, plaintiffs owned the copyright by assignment. *Id.* The *Russ Berrie* and *Vogue Ring* courts did not specifically hold that a failure to disclose preexisting works must result in harm to a defendant or invalidity of the copyright in order to preclude enforcement of the copyright. Nonetheless, they are completely harmonious with *Testa* insofar as both cases found that the works at issue lacked the originality to qualify for copyright protection when compared with the nondisclosed, preexisting work. *Russ Berrie*, 482 F.Supp. at 983–84, 987, 989; *Vogue Ring*, 410 F.Supp. at 612. Thus, in both cases, the existence of the non-disclosed works by itself invalidated the plaintiff's copyrights.[14]

B. *Bandai's Legal Defense*: Bandai raises a defense, directed at both copyright claims, which is essentially of a legal nature. Before applying the preceding copyright law to the facts of this case, this court will resolve this defense as a matter of law.

Bandai has produced evidence in the form of the deposition testimony of the Copyright Examiner who processed Midway's copyright applications that the applications were not substantively examined to verify the originality of the Midway works. Bandai strenuously argues that 17 U.S.C. § 410(a) requires the Copyright Office to conduct such an examination for, *inter alia*, originality. Defendants contend that, in light of the Office's failure to conduct such an examination, Midway's certificates cannot form the basis of a *prima facie* showing of originality in Midway's works. Indeed, Bandai contends that the Office's failure renders the certificates invalid.

This argument skirts the borders of bad faith. The House Report on the 1976 Copyright Act explicitly states that, "[U]nlike a patent claim, a claim to copyright is not examined for basic validity before a certificate is issued". H.R.Rep.No. 94–1476, 94th Cong. 2d Sess., 157, *reprinted in* 1976 U.S.Code Cong. & Ad.News 5659, 5773.[15] Additionally, the courts which have

14. It is true that the *Vogue Ring* court stated that even if plaintiff's work displayed the requisite originality for copyright protection, it would still have declined to enforce the copyright because plaintiff's conduct was so inequitable as to comprise misuse of the copyright. 410 F.Supp. at 616. It should be noted, however, that in reaching this finding of copyright misuse, the *Vogue Ring* court did not rely solely on plaintiff's failure to disclose preexisting works. The court also considered a warning published by plaintiff which falsely stated the consequences of copyright infringement. *Id.* at 617. In addition, the court noted the incredible statements regarding creation of the work made by plaintiff corporation's president at trial. *Id.* The court found his assertions of independent creation particularly egregious in light of the fact that plaintiff corporation had been one of the manufacturing sources of the preexisting work. *Id.* at 614, 616–17. Furthermore, the *Vogue Ring* court specifically noted that the failure to disclose was substantial because of the "identical nature" of the plaintiff's creation and the preexisting work. *Id.* at 615. Thus,

*Vogue Ring* cannot be said to stand for the proposition that a failure to disclose a preexisting work will *per se* render a copyright unenforceable.

15. Nimmer notes that the House Report contains much material vital to understanding the Act and that it indeed sometimes has more information about the Act than the Act itself. 1 Nimmer vii. Defendants assert that reliance on legislative history is improper when interpreting an unambiguous statute. § 410(a), however, is not necessarily such a statute. It does not define or explain the "examination" the Copyright Office is to undertake when reviewing an application. That examination could therefore range from the detailed search advocated by defendants to the mere check for an application's facial adequacy actually intended by Congress. Given the range of possible interpretations, § 410(a) cannot be considered so unambiguous as to preclude resort to legislative history.

faced this issue have apparently all held that a copyright registration does not require the substantive search advocated by defendants. *Donald v. Uarco Business Forms*, 478 F.2d 764, 765 n.1 (8th Cir. 1973) ("A copyright certificate will be issued through a registration procedure in which the validity of the copyright is not examined."); *Cadence Industries Corp. v. Ringer*, 450 F.Supp. 59, 65–66 (S.D.N.Y.1978) ("It is undisputed that the Copyright Office has neither the facilities nor the authority to rule upon the factual basis of applications for registration or renewal, and that where an application is fair upon its face, the Office cannot refuse to perform the 'ministerial duty' of registration imposed upon [it] by the law."); *Stein v. Benaderet*, 109 F.Supp. 364, 366 (E.D.Mich.1952), *remanded on other grounds*, 214 F.2d 822 (6th Cir. 1954) ("There is no such [patent type] search or examination when a copyright is secured. It issues almost automatically and there is no prior art to contend with.") If a new rule of copyright examination procedure is to be announced, it will be some other court which proclaims it. It is clear that Bandai's attack on Midway's copyrights based upon an insufficiency in the Copyright Office's examination of the application fails as a matter of law.

### IV. *Application of Copyright Law to the Instant Case*

*A. Galaxian* : In assessing the strength of Midway's case with regard to the Galaxian copyright, this court must focus on the elements of plaintiff's *prima facie* case as discussed in the preceding section. The initial inquiry must center on Midway's showing of ownership and validity of its copyright. Midway relies primarily on the *prima facie* evidentiary weight to be accorded its registration certificate.

Defendants only challenge plaintiff's certificate's effect as *prima facie* evidence of Galaxian's originality. Indeed, defendants request a ruling that they have successfully rebutted plaintiff's certificate in this regard so that plaintiff must prove its work's originality at trial. As discussed above, such a ruling would entail a finding by this court that the similarities between plaintiff's work and the allegedly pre-existing work are so great as to mandate a directed verdict that plaintiff had copied the prior work.

■ This court declines to make such a ruling. Bandai offers only the Taito Space Invaders video arcade game as a pre-existing work to Midway's Galaxian.[16] This court viewed a videotape of the Space Invaders game at the initial hearing in this case. It is true that the creator of Midway's Galaxian admits having had access to and having viewed Space Invaders many times before designing his game. Nonetheless, the most cursory perusal of the two works indicates that the only similarity between them is in the idea of the underlying games, i.e., outer space games wherein a defendant base or rocket ship, controlled by the player, attempts to fend off attacking hordes of aliens.[17] When the expressions of the Galaxian and Space Invaders works are compared, it is clear there is no similarity beyond that of idea. The Space Invader aliens are abstract geometric shapes whose motions suggest a walking or running action. They always move in a pack, in lockstep, straight-line, horizontal movements across the screen. They regularly descend as a pack, one line at a time, toward the bottom of the screen. As previously described, the Galaxian aliens are unmistak-

---

**16.** Bandai alludes to other space theme video games which it suggests Midway relied on in creating its Galaxian. The only evidence of such games which Bandai has chosen to furnish this court, however, consists of poor quality xeroxes of promotional pamphlets regarding them. It is impossible to discern either the appearance of these games' characters or the way the games play from these brochures. Bandai has thus failed to present sufficient evi-

dence as to these games; only Space Invaders will be considered.

**17.** Even if plaintiff had copied the idea of the Space Invaders game, this would not comprise a copyright violation. *See, e.g., Atari*, 672 F.2d at 614–15. Indeed, in its own defense, Bandai strenuously urges the accepted rule that copying ideas is not actionable.

ably insects, their shape being highly dissimilar to that of the Space Invaders. Their movements convey flying rather than walking. Although they hover in a pack, the Galaxian aliens attack singly or in smaller formations. When they attack, they descend in arcs and curve across the screen rather than in the rigid, straight-line path taken by the Space Invaders pack. Additionally, the Galaxian aliens invert before they attack, a feature absent from Space Invaders. Simply put, this court can detect no meaningful similarity of expression between Galaxian and the allegedly pre-existing Space Invaders.[18] Indeed, rather than honoring Bandai's requested finding that it has rebutted plaintiff's *prima facie* showing of originality, this court's examination of the two works compels it to hold that, as a matter of law, no reasonable jury could find that Galaxian copied Space Invaders to the point of appropriation. Since a verdict would thus be directed for Midway on the issue of whether it copied from Space Invaders, summary judgment on that issue is appropriate now. Bandai has failed to make even a reasonable showing that Space Invaders negated Galaxian's originality. Accordingly, this court finds that the certificate remains *prima facie* evidence of Galaxian's originality.[19]

Turning to the question of Bandai's access to Midway's Galaxian game, there is uncontroverted evidence that Galaxian is one of the most popular video arcade games to date and has been widely published in both America and Japan. Defendant Bandai, although not in the video arcade business, produces closely related products. In fact, by asserting that *its* Galaxian was based in part on Taito's Space Invaders,

18. Bandai points to a questionnaire regarding Galaxian circulated among Namco employees by the creators of Namco's Galaxian. This questionnaire sought employee reaction on numerous aspects of the Galaxian game. One question states, "There are similarities with Invader game [presumably Taito's Space Invaders] and what is your opinion on such respect." The employee may then answer that this is good because Invader was popular or else that it was impossible to state whether that was good or bad. Bandai argues that this indicates Namco's acknowledgement that the games were highly similar and its concern about the possible effect of such similarities. This one question (out of six pages of questions) cannot reasonably support such broad inferences as Bandai seeks to establish. It states only that there are *some* similarities; this weak statement can refer as easily to the ideas underlying the games as the expression of same. The inferences to be drawn from this question cannot overcome the missing similarity of expression between the two works. Much more compelling evidence *against* a finding of Space Invaders as a pre-existing work is the testimony of the *creator* of Bandai's Galaxian, one Maniwa, that the shape and design of the Space Invaders characters are *not*, in his opinion, similar to those of Midway's Galaxian.

19. Even if this court's resolution of the rebuttal issue were erroneous, this court would find only that the question of rebuttal remained one for the trier of fact, not that defendants had successfully rebutted the *prima facie* weight accorded plaintiff's certificate. There is ample evidence in the form of deposition testimony by the Namco employee who created the Galaxian work as to the originality of the work. Thus, at a minimum and in the alternative, this court finds that plaintiff has made a sufficient showing of originality of its work to support the issuance of a preliminary injunction. As previously indicated, the court believes that this determination adequately disposes of Bandai's argument that Midway's copyright should not be enforced because Midway failed to disclose Space Invaders as an allegedly preexisting work. One cannot be faulted for failing to disclose that which is not a preexisting work. Even were Space Invaders a preexisting work, Bandai has failed to introduce any evidence that Midway's failure to disclose was knowing or intentional. Defendants only point to the fact that Midway, on attorney-client privilege grounds, instructed the person who completed and filed the copyright applications not to answer questions as to what an attorney for Midway told him relative to the information contained in the applications. From this, defendants wish this court to infer that Midway is desperately trying to hide something.

The deposition in question took place in March of this year. This court has not been made aware of any motion to compel discovery on this point. Nor does this court recall any discovery taken of Midway employees directly on the issue of Midway's knowledge of preexisting works. Given these omissions by the defendants, it is a little late in the day to ask this court to draw adverse inferences from Midway's assertion of the attorney-client privilege. The withdrawal of the Space Invaders issue from this case does not, of course, preclude Bandai from presenting at trial evidence of other pre-existing works regarding Galaxian.

Bandai has conceded an awareness of arcade games in general which *a fortiori* demonstrates access to one of the most popular of all such games. Additionally, it is beyond all belief that the name Galaxian was chosen without awareness of the Midway game. Quite to the contrary, one Gatto, a vice-president of Bandai America, has stated that in adopting the name Galaxian, Bandai sought to benefit from the popularity of Midway's Galaxian game.

[39–42] Circumstantial evidence is sufficient to establish access. *Franklin Mint*, 575 F.2d at 64; *Testa*, 492 F.Supp. at 202. All that is required is a reasonable possibility that a defendant had an opportunity to view a copyrighted work. *Ferguson v. National Broadcasting Co.*, 584 F.2d 111, 113 (5th Cir. 1978). Wide publication of a work will suffice to show access. *Stratchborneo v. Arc Music Corp.*, 357 F.Supp. 1393, 1403 (S.D.N.Y.1973); 3 Nimmer § 13.02[A], p. 13–12; *Bright Tunes Music Corp. v. Harrisongs Music, Ltd.*, 420 F.Supp. 177, 179 (S.D.N.Y.1976) (defendant held to be aware of song which had been No. 1 and No. 12 on the charts in, respectively, United States and United Kingdom); *R. Dakin & Co. v. Charles Offset Co., Inc.*, 441 F.Supp. 434, 438–39 (S.D.N.Y.1977) (use of copyrighted work in national advertising campaign sufficient to show access). Given the legal standard for access and the facts adduced by plaintiffs, this court finds that no reasonable jury could decide that defendants did not have access to Midway's Galaxian. Defendants' access is thus no longer an issue in this case; plaintiff need not prove it at trial.

 Under Third Circuit case law, the next inquiry is whether, given defendant's access, plaintiff has shown that defendant copied by demonstrating substantial similarity. As noted in the general discussion of copyright law, expert testimony, dissection, and detailed analysis of the two works are appropriate in this branch of the substantial similarity inquiry. This court has compared the two works *ad nauseam*. After its detailed examination of the works, this court discerns such overwhelming similarity that it believes no reasonable jury could find that Bandai's work was not copied from plaintiff's, Bandai's denials notwithstanding.

This determination rests largely on the works themselves. Accordingly, attention is directed generally to the description of the games set forth in this opinion. Without seeking to exhaust all the similarities it perceives, this court will note some of the more pronounced examples undergirding its finding of copying.

Firstly, Midway has produced an affidavit and accompanying report from two experts (professors of music at the University of California at Los Angeles) who conclude that the musical themes of the two Galaxian games are fundamentally identical. Bandai has introduced no evidence to the contrary. Rather, it cites case law holding that expert testimony is not admissible to show substantial similarity. This position is clearly wrong as a matter of law in this Circuit, at least insofar as substantial similarity for copying purposes is concerned. *Universal Athletic*, 511 F.2d at 907.

 Secondly, the Bandai aliens are unmistakably insectile as are those in Midway's game. In addition, Bandai's insect characters bear a close resemblance to Midway's, both having brightly lighted eyes and two-toned bodies.[20] Furthermore, the

---

**20.** The two sets of aliens are not literally identical. Identity of expression is not, of course, required for a finding of infringement. Moreover, the *Atari* case cautions that dissimilarities stemming from the different media in which the works appear should not inhibit a finding of infringement. *Atari*, 672 F.2d at 618 n.12. It seems apparent that, for example, the handheld aliens cannot achieve the same detail and brightness of the arcade aliens, nor approximate their natural movements. Such differences dictated by the medium should be taken into account when deciding the copying issue. Furthermore, limitations on the size, number or formation of the characters imposed by the medium should also not be utilized to excuse substantial similarity between works. Similarly, the more limited capabilities of the speakers found in the handheld units may not mask impermissible similarities in the audio portions of these works. In short, the degree of substantial similarity required to show copying

Bandai game mimics the background of Midway's Galaxian with twinkling "stars" set against black space. The Bandai game has the same sort of sequential lighting of the stars, creating the same illusion that the characters are moving through space toward the top of the screen. The only difference between the backgrounds of the two games is that Bandai's stars are all of one color (almost certainly a function of the handheld medium's limitations) while Midway's are multihued.

Finally, the Bandai game's play and sequence of images is extremely similar to Midway's. Thus, the Bandai aliens fly in a pack and peel off to attack singly or in small groups. As they attack, they invert, as do the Midway creatures. Bandai's aliens also appear to flap their wings as they fly and attempt to collide with the player's ship.

Attempting to negate the foregoing similarities, defendants advert to a number of minor variations,[21] none of which can overcome the basic similarities this court perceives. Through Maniwa, Bandai also alleges that Space Invaders in part provided the source of Bandai's Galaxian. A comparison of these two games renders that

assertion as untenable as Bandai's assertion that Midway's game was based on Space Invaders.

In its dissection of the games, this court has detected extremely strong similarities, supported in one respect by expert opinion. Bandai has failed to challenge the fact of these likenesses. On the basis of the foregoing, the court finds that plaintiff would be entitled to a directed verdict on the issue of defendants' copying as no reasonable jury could credit Bandai's assertion of independent creation.[22] That issue is thus no longer in the case and plaintiff will not be required to prove it at trial.

There remains the final and dispositive issue of substantial similarity going to the question of improper appropriation. To obtain summary judgment on this question and thereby prevail on its Galaxian copyright claim, Midway must show that no reasonable jury, looking at the games as a whole, could find that Bandai's Galaxian was not so substantially similar to Midway's work as to constitute an improper appropriation of the latter. The test here is the response of the ordinary lay person. At this point in the substantial similarity in-

must be adjusted to take into account the fact that only a lesser degree of duplication may be possible in a different medium.

21. For example, Bandai notes the differing colors of the two sets of aliens, the smaller number of background dots in the Bandai game and the fact that they are all one color, etc.

22. Bandai has provided voluminous notes, diagrams, drawings and the like as evidence that it independently designed and created both of its games. This evidence may show that defendants did not duplicate Midway's works as if by the use of a photocopy machine. The absence of such outright duplication is clear, however, from a comparison of the works in question. The record of the steps necessary to translate a game concept into the handheld video game medium does not establish independent creation of the game's characters, sounds, sequences, etc. Defendants' evidence may prove independent creation of the physical elements of their games and computer program but this is not probative of whether defendants engaged in anything other than a translation of plaintiff's works into another medium. It is not as though defendants introduced documentary evidence showing, for example, design of their

game prior to publication of Midway's works. In short, Bandai's evidence depicts only creation, not independent creation. Even the infringer who traces the outline of another's work must move his own hand across the page. Defendants' evidence bears on the mechanics of devising an audiovisual display, *not* on the creation of the audiovisual work itself. *Cf. Durham Industries*, 630 F.2d at 911 (plaintiff's work held not copyrightable because "mere reproduction of [preexisting works] in [a different medium], even though the adaptation of the preexisting works to this medium undoubtedly involved some degree of manufacturing skill, does not constitute originality as this Court has defined the term."). Thus, a reasonable jury could not credit Bandai's proffered documents as evidence of independent creation. This is particularly true in light of Bandai's own illogical statement, made in argument to this court, that although it admitted copying Midway's games' ideas, it achieved this by deriving its games' forms of expression from preexisting works *other* than those of Midway. *See* Defendants' Brief in Opposition to Motion for Summary Judgment at pp. 12, 19.

quiry, the other factors noted by the *Universal Athletic* court must be considered.

■■■■■ *Universal Athletic* states the basic principle that copyright protection extends only to the expression of an idea, not to the idea itself. 511 F.2d at 906; 17 U.S.C. § 102(b)(1977). Furthermore,

> When idea and expression coincide, there will be protection against nothing other than identical copying of the work. . . . [T]he scope of copyright protection increases with the extent expression differs from the idea . . . . The idea and the expression will coincide when the expression provides nothing new or additional over the idea.

*Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1168 (9th Cir. 1977).[23]

As a result, copyright protection does not encompass games as such, *Atari*, 672 F.2d at 615, since they consist of abstract rules and play ideas.

Audiovisual works such as these are primarily unprotectable games. *Atari*, 672 F.2d at 617. As the Seventh Circuit noted, however, the particular forms in which they are expressed—"shapes, sizes, colors, sequences, arrangements, and sounds"—add something beyond the mere game idea. *Id.* Thus, "The audio component and the concrete details of the visual presentation constitute the copyrightable expression of that game 'idea' ". *Id.* Nonetheless, Bandai argues that any similarities between its games and Midway's are nonactionable since they result from an allegedly inevitable connection between the expressions and the similarities in the underlying unprotectable ideas.

■■■■■ Bandai's position fails as a matter of law. It assumes, *sub silentio*, that the idea of Midway's Galaxian game actually includes the physical characteristics of the characters involved. If such reasoning were accepted, a copyright defendant could always avoid liability merely by describing a plaintiff's work in great detail and then labeling that description the "idea" of plaintiff's work. The "idea" of any work could always be defined in such detail that the description of the expression would add nothing to the "idea", thus allowing a defendant to engage in all but verbatim copying. Such a ploy cannot be allowed. As the *Krofft* court noted, the description of the work for the purpose of identifying its idea must be a simple one. Here, the idea of Midway's Galaxian is relatively simple and easily expressed: it is an outer space video game in which the player controls a rocket ship defending itself against a swarm of computer-controlled attacking aliens who attempt to bomb and collide with the player's ship. With the idea of Midway's Galaxian thus identified, it is clear that Midway's copyright does not in the least preclude the creation of an entire universe of other space video games (e.g., Space Invaders) based on the same, unprotected idea. It is also clear that, in expressing its version of the game idea, there was no necessity for Bandai to mimic Midway's expression of this idea which involves such elements as the particular insectile shape of the aliens, their movements, and the musical theme.

Another concern of the *Universal Athletic* court was that the degree of copyright protection reflect the degree of creativity involved in the work. The foregoing discussion of the idea—expression dichotomy should make clear that, in its expression of the basic game idea, Midway has exhibited a good deal more than a minimal amount of creativity.[24] Accordingly, it can be said nei-

---

**23.** The *Krofft* court provides a test for determining whether idea and expression differ: "If, in describing how a work is expressed, the description differs little from a *simple* description of what the work is, then idea and expression coincide." *Krofft*, 562 F.2d at 1168 n.10 (emphasis added). Put otherwise, if a work cannot be described in abstract terms, the expression adds nothing to the idea. This court adopts this general approach in the instant case.

**24.** In contrast, the work in the *Universal Athletic* case involved only the very minimal creativity inhering in stick figure drawings. This in part resulted in the Third Circuit's finding that there could be no substantial similarity between the works. 511 F.2d at 908–09.

ther that substantial similarity between the Galaxian games is lacking because only a minimal degree of creativity is involved nor that Midway is entitled only to a minimal degree of protection for the same reason.

The final factor raised by the *Universal Athletic* court is the nature of the protected material and the setting in which it appears. After quoting *Universal Athletic* for that proposition, the *Atari* case goes on to state that "Video games, unlike an artist's painting or even other audiovisual works, appeal to an audience that is fairly undiscriminating insofar as their concern about more subtle differences in artistic expression." 672 F.2d at 619. A player caught up in the heat of a video battle would tend to overlook many minor differences between the games. *Id.* Additionally, it must be remembered that Bandai's works are cast in a different medium which imposes limitations on the degree of similarity an infringer can achieve. *Id.* at 618 n.12. Thus, this last factor weighs in favor of a finding of substantial similarity.

Examination of the *Universal Athletic* factors makes clear that they either present no obstacle to a finding of substantial similarity for appropriation purposes or else actually support such a finding. Nonetheless, this court declines to enter judgment for Midway on its summary judgment motion. This declination follows from the principle that the ultimate determination of substantial similarity is one for the trier of fact. As previously discussed, to direct a verdict for plaintiff on this issue, the works must be virtually identical.[25] Although the question of such identity is a close one here, this court cannot state that it is certain such identity exists. In a close case, the court cannot substitute its judgment for that of the trier of fact. Accordingly, the Galaxian claim must go to the trier of fact but solely on the issue of whether an ordinary lay observer would detect such a substantial similarity between the two works as to show the copying went so far as to constitute improper appropriation.[26]

B. *Packri Monster.*[27] As with Galaxian, Midway relies primarily upon its certificate of registration to prove the ownership and validity, including the originality, of its Pac-Man copyright.[28] Bandai attacks Midway's certificate principally on the basis that certain alleged preexisting works rebut the *prima facie* presumption of Pac-Man's originality. Bandai additionally asserts that the very failure to disclose these preexisting works to the Copyright Office comprises copyright misuse barring enforcement of the copyright.

**25.** *See* note 11 *supra; Knickerbocker Toy,* 491 F.Supp. at 528 (plaintiff granted summary judgment where works "nearly identical").

**26.** As has been stated throughout this opinion, the Third Circuit draws a distinction between substantial similarity for purposes of copying and for purposes of appropriation. The inquiry as to each is different. Thus, there is no inconsistency in this court's granting summary judgment on the substantial similarity question for copying purposes while simultaneously denying it for appropriation purposes.

The court wishes to make clear its belief that, on the basis of the record and applicable law, Midway has unquestionably made a sufficient showing of likelihood of success on the merits to justify the grant of a preliminary injunction. Furthermore, as to the other requirements for a preliminary injunction, the court believes that the discussion of them in connection with Packri Monster *infra* is equally applicable here. The court declines to enter a preliminary injunction as to Galaxian only because it appears to be unnecessary, Bandai having ceased selling that game some time ago. Should plaintiffs later demonstrate the renewed need for such injunctive relief, it will issue as a matter of course on the strength of the findings contained in this opinion.

**27.** Preliminarily, it should be noted that much of the same legal analysis employed by the court with regard to the Galaxian claim is applicable here. Where appropriate, reference will be made to such preceding discussion in the interests of brevity and efficiency.

**28.** Midway has also supplied deposition testimony of one Iwatani, the Namco employee who created Pac-Man's game idea and rules as well as its characters. Iwatani stated that these were his personal creation, developed through his own efforts, and that he did not base Pac-Man's characters on the alleged preexisting works identified by Bandai.

In assailing Pac-Man's originality, Bandai relies upon three allegedly preexisting works which it contends Midway copied: Sega's Head-On video arcade game, a Japanese cartoon ghost character called Kyutaro, and Tomy's mechanical Mr. Mouth game. These will be examined in turn. In so doing, the court will be guided partially by the Seventh Circuit's isolation of the protectable elements of Pac-Man.[29] Of most immediate import are the "gobbler" or Pac-Man figure and the four "ghost monsters". *Atari*, 672 F.2d at 618.

Head-On is alleged to contain the basic play concept of Pac-Man. It supposedly consists of a maze chase game involving player and computer-controlled race cars and dots on the floor of the maze. The player seeks to steer his car over the dots, which disappear as he does so, while attempting to avoid a collision with one of the computer-controlled cars. Since defendants chose not to provide the court with a sample or videotape of Head-On,[30] there is little for the court to say except that defendants have failed to bring this allegedly preexisting work before it. The court thus cannot credit Bandai's argument that Head-On comprises a preexisting work relied upon by plaintiff. Accepting for the moment, however, defendants' representations as to the character of Head-On, it appears that that which plaintiff would have appropriated from Head-On would comprise the Pac-Man game idea or elements closely allied with it and thus not fall within the scope of Midway's copyright in any event. *See Atari*, 672 F.2d at 617 (maze and dots have close connection to underlying game and thus are protected only from virtually identical copying; Pac-Man game idea includes concept of player navigating maze while attempting to avoid computer-controlled opponents). Thus, even if Midway copied Head-On, it was only as to non-protectable game ideas.

Defendants did provide the court with adequate examples of the ghost character Kyutaro. Namco's Iwatani admitted familiarity with this character. Bandai alleges that Namco copied Kyutaro in creating its own four ghost-like characters.

After carefully comparing the Midway ghosts and Kyutaro, the court concludes that a reasonable jury could not discern substantial similarity between the two for copying purposes and thus could not find that Kyutaro was a preexisting work. A comparison of the two characters reveals that Kyutaro is dramatically more anthropomorphic, possessing not only eyes but eyebrows, a prominent and expressive mouth, a few strands of hair, arm-like appendages, and two fully-developed feet. Of all these characteristics, Midway's ghosts have only eyes. Rather than actual feet, Midway's ghosts have four points at their bottoms which might suggest rudimentary feet. The only similarity besides the presence of eyes in Midway's ghost is its overall shape. Even as to this, Kyutaro is taller and resembles a cylinder with a rounded top while the ghosts are squatter and resemble gumdrops. This similarity coupled with the presence of eyes is not, in the face of significant differences, sufficient to support an inference of copying by Midway.[31] Defendants thus have not rebutted the presumption of originality attaching to Midway's ghosts.

Finally, there is the question of the Pac-Man and Tomy's Mr. Mouth, apparently called Pac-Man in the Japanese tongue. Mr. Mouth consists of two half clam shell-like yellow plastic pieces joined at one end. On the top half is a black representation of expressive eyes and perhaps a mask. When in play, this mechanical game is so arranged as to rotate around its vertical axis while

---

**29.** The court recognizes that Bandai challenges the copyright validity of these elements; nonetheless, the points of *possible* protection must be identified for purposes of comparison with the allegedly preexisting works.

**30.** Defendants furnished a poor quality xerox of a brochure regarding Head-On. It is impossible to glean from this xerox what degree of

similarity exists between Head-On and Pac-Man.

**31.** Naturally, were this finding erroneous, the court would still hold that plaintiff had shown a likelihood of success as to whether Kyutaro was a preexisting work.

the top shell repeatedly rises to an open position and then falls shut. When Mr. Mouth is open, players attempt to flip playing pieces into it from small spring-boards, tiddlywink-style.

Since there is lacking that virtual identity necessary to prove copying as a matter of law, this court cannot direct a verdict for defendants that the Pac-Man figure is copied from Mr. Mouth. Sufficient similarities exist, however, to warrant the question going to the trier of fact.

Bandai focuses on identifying individual works which arguably were precursors to individual elements of Pac-Man. In so doing, defendants naturally minimize the fact that, although Pac-Man may have various precursors as to certain of its elements, Packri Monster contains virtually all of the salient characteristics of Pac-Man. Put otherwise, the Pac-Man audiovisual work does not resemble any other *single* work whereas Packri Monster as a whole does resemble the preexisting Pac-Man work. This leads to consideration of the accepted copyright doctrine that a work may be entitled to copyright protection even though based on a prior copyrighted or public domain work "if the author, through his skill and effort, has contributed a distinguishable variation from the older works. In such a case, of course, only those parts which are new are protected by the new copyright." *Donald*, 426 F.2d at 1029. Only a minimal degree of originality in the new portions is required, although it must be more than merely trivial and must result from original creative work. *Id.* at 1030. *See* 1 Nimmer § 3.03, p. 3–8–11 (variation which renders derivative work distinguishable in any meaningful way from prior work will satisfy originality requirement); § 3.04, p. 3–12–16 (original material in derivative work will receive copyright protection). *Dollcraft Industries, Ltd. v. Well-Made Toy Mfg.*, 479 F.Supp. 1105 (E.D.N.Y.1978) is an illustrative case. In *Dollcraft*, defendant attempted to show that plaintiff's stuffed animal toys lacked originality because many of their features (bodies, arms, legs, etc.) had been used in the stuffed animal market for many years. 479 F.Supp. at 1114. The court rejected this argument, citing case law to the effect that the original combination of these preexisting features made the toys copyrightable. *Id.* at 1114–15. A contrary holding, the court noted, would compel a plaintiff to demonstrate novelty when the standard for copyrightability is only originality. *Id.* at 1115.

In light of the foregoing legal principles, Pac-Man must be examined for evidence of original elements which would be subject to copyright protection even if it were true that Midway had copied certain aspects of the game from prior works.[32]

The *Atari* decision makes clear that the gobbler and ghost figures are copyrightable, questions of preexisting works aside. *Atari* also stated, however, that the sequences and arrangements of Pac-Man were protectable. 672 F.2d at 617. *Accord, Stern Electronics*, 669 F.2d at 856–57 (repetitive sequence of images in a video game is copyrightable). In addition, the "distinctive gobbling action" of the Pac-Man character and "especially the way in which it disappears upon being captured" were apparently accorded copyright protection in *Atari*. 672 F.2d at 618. Finally, it appears that the *Atari* court also found protectable the "role reversal and 'regeneration' process" involving the game's characters. *Id.*

There exist at least two additional copyrightable elements other than the game's characters which were not identified by the *Atari* court. These are the game's musical themes, particularly the opening melody, and the "cartoon" sequence of images previously described. Defendants do not challenge the originality of these two features, nor for that matter, those adverted to by the *Atari* court. Thus, the certificate retains its prima facie evidentiary value as to these unchallenged elements. It is clear that between these elements and the ghost

---

**32.** To merely conclusorily state that in Pac-Man the combination of old elements itself was copyrightable would be unavailing. Since Pac-Man is primarily an unprotectable game, those elements of the work entitled to protection must be separated out.

figure this court has already determined was not copied from Kyutaro, plaintiff has demonstrated sufficient originality to support at least these features of its copyright. This is so because none of these features inhere in the preexisting works advanced by defendants and they constitute more than a trivial addition to these works.[33]

Turning to the question of access, there can be no doubt that plaintiff is entitled to summary judgment for the same reasons as expressed in the Galaxian discussion. In addition, Miyake, the creator of or development supervisor of Packri Monster conceded that someone from his design team could have seen Pac-Man during the creation of the Bandai game. Finally, defendants have admitted awareness of Pac-Man in general and a desire to capitalize on its popularity, reflected in the initial design of the Packri Monster mark which highlighted "Pack" and "Mon". See Gatto deposition.

■■ With regard to the issue of copying, this court believes that summary judgment in plaintiff's favor is called for as to those elements of Pac-Man, previously identified, whose originality and thus copyright protection are unchallenged. A detailed comparison of the two works shows that the Packri Monster monster displays the same distinctive gobbling action as the Pac-Man, depicted similarly as a mouth opening and closing. The highly distinctive role reversals and regenerations are present as well, albeit in a slightly modified form due to the limitations of the handheld medium.[34]

With regard to the opening musical themes of the two works, Midway has produced expert analysis which concludes that the two are fundamentally identical and that the Bandai theme was derived from Midway's. Bandai has declined to contest this analysis which is fully admissible on the issue of substantial similarity for copying purposes. Given these circumstances, the court must find that Bandai copied Midway's theme.[35]

Finally, as to the "cartoon" sequence, it is unmistakably clear that the Bandai sequence is virtually the exact duplicate of Midway's first cartoon sequence, previously described. In both sequences, the two characters appear at the right hand side of the screen, heading horizontally left, with the ghost/bogey pursuing the Pac-Man/monster. In both, the characters reach the left side. · In Pac-Man both disappear from the left side of the screen; in Packri Monster, only the monster so disappears. The roles then reverse, the Pac-Man/monster chasing the now vulnerable (as signified in the games' own fashions) ghost/bogey to the right side of the screen where they disappear and the sequence ends.[36] It is clear that, as is true with the musical themes of the games, absolutely no argument can be made that this sequence is intrinsic to the idea of the game. Bandai does not so argue; rather, it contends that the sequence was inspired by a cartoon break in the Space Invaders game during which an alien and a player's ship "move together". Mi-

---

**33.** In particular, the substantial nature of the musical theme cannot be denied. Evidence was presented showing that Pac-Man's opening melody has been incorporated in a popular song about the game. This song has achieved great commercial success resulting in royalty fees to Midway.

**34.** Thus, Bandai's game cannot exactly depict either character actually consuming the other, nor can the bogey change color to signal vulnerability. Instead, when the monster is eaten by a bogey, it appears briefly inside of the latter. A bogey's vulnerability is signaled by the steady appearance of a monster within it. When a bogey's vulnerability is about to end, the monster outline flashes on and off, simulating the flashing color changes of a Pac-Man ghost whose helplessness is drawing to a close.

Most significantly, when a bogey is consumed by a monster, it disappears and then rematerializes in the bogey room, a virtual reproduction of the same sequence in Pac-Man.

**35.** The creator of the Bandai game merely asserts that its music was based on his own feeling.

**36.** The only meaningful difference between the sequences is that in Pac-Man, the pursuing Pac-Man figure appears as larger than normal whereas in Packri Monster, the pursuing monster is the normal size. This difference is most likely due to the difficulty or impossibility of varying the size of the characters in the handheld medium.

yake deposition. Although this court viewed a videotape of the Space Invaders game, it does not in particular recall such a sequence. Defendants did not submit visual evidence of the Space Invaders sequence; thus, they have failed, at this juncture, to demonstrate that the Packri Monster sequence was derived from Space Invaders. Indeed, Miyake's testimony appears to indicate that the *idea* of a sequence rather than its content stemmed from Space Invaders. Midway cannot claim and this court would not countenance protection for the *idea* of having a cartoon sequence. Thus, Bendai could have any number of other sequences involving the game's characters [37] which would not infringe Midway's cartoon. It is only the exact sequence which is protected and which Bandai has apparently copied.[38]

As to the original elements of Pac-Man discussed above, this court finds such pervasive similarities that no reasonable jury could find Bandai did not copy Pac-Man. Summary judgment on the issue of copying as to those elements will thus be entered for Midway.

This court now reaches the ultimate question in the Pac-Man copyright infringement case: whether, as a matter of law, Bandai's copying went so far as to constitute improper appropriation of plaintiff's work. For the reasons which follow, the court answers this question in the negative.

As a preliminary matter, it should be noted that the idea/expression dichotomy is not seriously involved in this claim. The court has identified those elements which display sufficient originality to be protected as well as those which will be protected if found not to have been copied from preexisting works.[39] Neither set of elements is vitiated by too close a connection with the underlying Pac-Man game idea. As to that idea, this court agrees with the Seventh Circuit that it may be identified thusly:

> PAC–MAN is a maze-chase game in which the player scores points by guiding a central figure through various passageways of a maze and at the same time avoiding collision with certain opponents or pursuit figures which move independently about the maze. Under certain conditions, the central figure may temporarily become empowered to chase and overtake the opponents, thereby scoring bonus points.

*Atari,* 672 F.2d at 617.

This court's examination of the two works with an eye to gross features rather than details convinces it that a high degree of similarity between the games as a whole exists. Such similarity is revealed through the descriptions of the two games throughout this opinion and, in particular, the cumulative effect as a whole of the protected elements discussed immediately above.[40] Coupled with the court's own observations is Midway's extrinsic evidence of lay observer reaction to the similarities between the games. Thus, plaintiff has produced newspaper columns referring to Packri Monster as Pac-Man's "son" or as a Pac-Man-type game. Additional evidence of substantial similarity is Bandai's original

---

**37.** Assuming that Midway is not the owner thereof.

**38.** Should Bandai at trial introduce evidence showing derivation of its particular sequence from a source other than Midway, it may move the court to reconsider this grant of summary judgment as to the copying of the cartoon sequence issue.

**39.** In this connection, it should be remembered that defendants' argument of copyright misuse will turn in the first instance on whether there were preexisting works to Pac-Man. Furthermore, as noted previously, Bandai has not adduced evidence that Midway knowingly or intentionally failed to disclose the preexisting works, if any, to the Copyright Office. Finally,

Bandai has not demonstrated that it suffered prejudice or that the copyright would be invalid if such preexisting works are found. Indeed, it cannot prove that the copyright would be totally invalid in any event since this court has found other elements of originality in the copyright. Defendants' misuse argument must, at a minimum, abide the outcome of the preexisting works determination.

**40.** Although dissection is disfavored on the issue of substantial similarity going to appropriation, the ordinary observer test must descend into detail where necessary to distill the protectable elements of a work. *Atari,* 672 F.2d at 614.

decision, later rescinded, to include yet another feature of Pac-Man in Packri Monster, i.e., a fruit target. Finally, there is the testimony of Miyake, Packri Monster's creator, that the two games are quite similar.[41]

Although the court believes that plaintiff has made an extremely strong showing on the merits, the ultimate substantial similarity issue nonetheless remains one for the trier of fact. With regard to the musical themes, for example, plaintiff's expert opinion is irrelevant on this ultimate question. *Universal Athletic*, 511 F.2d at 907. Furthermore, there remain fact issues as to the scope of the Midway copyright with regard to the game's characters. Resolution of these issues can more appropriately be achieved in the context of the similarity of the works as a whole.

Denial of summary judgment for plaintiff on the ultimate question of copyright infringement does not end the matter. Plaintiff has made such a strong showing of likelihood of success on the merits [42] that it is entitled to its requested preliminary injunctive relief.[43]

Turning to the irreparable injury question, this court adopts what it believes to be the emerging trend in copyright case law: where a substantial likelihood of success on the merits has been shown in a motion for a preliminary injunction, irreparable injury will be presumed. Even in the absence of this presumption, the court finds that Midway has made a sufficient showing of irreparable injury to warrant injunctive relief. Midway has spent large sums in developing and popularizing its Pac-Man game. One of the fruits of that effort are the benefits obtainable through the reproduction of that game in the handheld medium. Unauthorized infringing games divert those benefits and jeopardize the investment Midway has made in Pac-Man. In addition, insofar as infringing games may well be identified with Midway's work, such unapproved units can reflect poorly on the reputation and popularity of Midway's games in general and its licensed, authorized handheld units in particular. *See Klitzner*, 535 F.Supp. at 1259 (deprivation of ability to control nature and quality of defendant's goods comprises serious harm to plaintiff; probable damage to plaintiff's good will never accurately compensable). Furthermore, although it is clear that Pac-Man has enjoyed success virtually unprecedented in video arcade games, it is equally clear that such games have an unpredictable, if not short, life span. *Atari*, 672 F.2d at 620. Any damage done by an infringing work can thus be completely irreparable as the game may fade from the scene before the final rights of the parties are adjudicated. Finally, the evidence suggests that, absent an injunction, Bandai will seek to market 90,000 or more units of Packri Monster in the United States. The sheer volume of such sales indicates that the injury suffered by Midway will not be trivial. These elements suffice to show irreparable injury especially when, as this court's earlier discussion shows, the Third Circuit at a minimum appears to accept a lesser showing of irreparable injury in a copyright case where there is a strong showing of a likelihood of success on the merits. In the instant case, plaintiff has made a very strong showing of such likelihood of success.

Two additional factors are the questions of balancing of hardships and where the public interest lies. Bandai alleges it will lose a good deal of its annual

---

**41.** An examination of the *Universal Athletic* factors—degree of originality, nature of audience, etc.—strengthens Midway's case as to Pac-Man. *See* discussion of these factors in Galaxian section of this opinion *supra*.

**42.** Plaintiff has shown a strong likelihood of success on the merits as to those elements of the game whose protection under copyright law is unquestioned. Since success on these elements alone would lead to a finding of copyright infringement, a preliminary injunction is warranted.

**43.** Indeed, if any of this court's decisions granting summary judgment on certain issues is in error, the court would nonetheless still find that plaintiff had made a sufficiently strong showing on that issue to support a preliminary injunction.

income and sales if enjoined. It also asserts that its reputation will be injured if required to cease selling its games and it is ultimately vindicated. As to the latter argument, the court has determined that such vindication is highly unlikely. As to the former, advantages stemming from a deliberately plagiarized work do not give an infringer standing to complain that his "vested interests will be disturbed." *Atari*, 672 F.2d 620. Furthermore, the court rejects any attempt by Bandai-America to portray itself as a frail business in danger of ruin if a preliminary injunction issues. The evidence adduced thus far strongly suggests that Bandai-America is but one unit of a large Japanese toy concern with operating arms throughout the world. Finally, as to the public interest question, a preliminary injunction will "preserve the integrity of the copyright laws which seek to encourage individual effort and creativity by granting valuable enforceable rights." *Atari*, 672 F.2d at 620. Bandai has advanced no compelling countervailing public interest. Thus, the public interest lies in the grant of the injunction.

The foregoing constitutes the findings of fact and law supporting this court's entry of a preliminary injunction, dated July 2, 1982, prohibiting the importation or sale of Packri Monster games in the United States.

## V. *Trademark Claims*

A. *Galaxian*: Midway seeks summary judgment on its trademark infringement claim under 15 U.S.C. § 1125(a) (1982). In support of this motion, plaintiff relies essentially upon the distinctiveness of its mark, the identical nature of the two marks, and the evidence it has adduced of defendants' intent to benefit from the good will and popularity of Midway's Galaxian. Plaintiff contends that these elements are sufficient to demonstrate likelihood of confusion and thus warrant summary judgment. Defendants oppose summary judgment primarily by adverting to the ten

factors going to likelihood of confusion set forth in *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1229 (3d Cir. 1978) and alleging that Midway has not satisfied each.[44] They also note that in adapting the mark "Galaxian", they did not copy the exact design of plaintiff's mark.

Plaintiff is entitled to summary judgment on this trademark issue. "Galaxian" is clearly a distinctive mark as it is an arbitrary or fanciful name not descriptive of the product. It is therefore entitled to broad protection. 3 Callmann, Unfair Competition, Trademarks, and Monopolies, § 70.1 (1969). As such, no proof of secondary meaning is required. *Scott*, 589 F.2d at 1228; *Caesars World, Inc. v. Caesar's Palace*, 490 F.Supp. 818, 822–23 (D.N.J.1980). Plaintiff need only show that defendants' mark is likely to cause confusion in order to prevail. *Scott*, 589 F.2d at 1228.

The factors in the Third Circuit going to the likelihood of confusion are:

(1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of the public because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner

---

44. That defendants were able to import their game in the face of an ITC exclusion order regarding the mark "Galaxian" is irrelevant insofar as plaintiff has asserted, and Bandai has not contested, that the order was directed only at *arcade* games bearing that mark. Defendants do not *directly* contest plaintiff's ownership of the mark; they do not challenge Midway's assertions of prior and continuous use of the mark in the United States.

to manufacture a product in the defendant's market.

*Scott*, 589 F.2d at 1229.

An examination of these factors in turn compels the conclusion that plaintiff has shown likelihood of confusion as a matter of law.[45]

(1) *similarity of marks* :

The names involved are identical. The Third Circuit has noted that use of the exact trademark gives rise to a great likelihood of confusion. *United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 142 (3d Cir. 1981).

(2) *strength of owner's mark*:

An arbitrary or fanciful mark, such as "Galaxian", is inherently a strong mark. *See AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 349 (9th Cir. 1979).

(3) *price of goods/other factors showing consumer care in purchasing*:

There is no dispute that plaintiff's machines cost about $2,000 while defendants' cost $30 to $50. There can also be no dispute that no one will buy defendants' goods thinking they are buying an arcade machine. This, however, is not relevant as will be discussed below (*see* (7) and (8)). On the other hand, the fact that defendants' goods are games or toys directed largely at children supports plaintiff's position by indicating that the ultimate purchasers of defendants' games are not likely to exercise a great deal of attention or care in acquiring these goods and will be more likely misled by an identity in trademark.

(4) *length of time defendant has used mark without evidence of actual confusion*:

It appears that defendants had ceased marketing Galaxian by early 1982 after only a year or so of sales. Thus, the absence of evidence of actual confusion is of little probative value here given the short period of availability of the goods in question. *Cf. Scott Paper*, 589 F.2d at 1231 (small number of instances of actual confusion unpersuasive where there was huge volume of sales).

(5) *intent of the defendant in adopting the mark*:

Plaintiff has introduced overwhelming evidence that defendants intended to benefit from the good will and popularity of plaintiff's Galaxian game. The evidence includes admissions by Bandai's vice-president, Gatto, that the mark was chosen to capitalize on the popularity of the Midway game. In addition, the packaging of the game itself refers to it as a portable arcade game and a replica of the most popular arcade games.[46] Bandai has conceded in argument that it hopes its games will be bought by people "who have favorable association with the game concepts of the Galaxian ... arcade game." Defendants' brief in opposition to motion for summary judgment at p. 20. There can be no reasonable doubt as to defendants' intention in adopting the mark.[47]

(6) *evidence of actual confusion*:

None has been presented as to Galaxian but such evidence is not required.

---

**45.** Preliminarily, it must be noted that there is no requirement that a plaintiff produce strong evidence on *each* factor. This follows from Third Circuit case law recognizing that one of the factors, actual confusion, need not be shown at all. *United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 142 (3d Cir. 1981).

**46.** Plaintiff has also introduced evidence that in Japan, defendants have referred to their games as the Galaxian arcade game made portable, etc. Closer to home, it should be noted that the February 1981 issue of Toy & Hobby World

magazine contains a picture of Bandai's Galaxian game and the caption "Today's most popular *arcade game Galaxian* is now available in this portable version..." P. 114. (Emphasis added). This appears to be part of a Bandai press release published by the magazine.

**47.** *See Estate of Presley v. Russen*, 513 F.Supp. 1339, 1368 (D.N.J.1981) (fact that defendant adopted a mark with intent to obtain unfair commercial advantage from plaintiff's reputation may suffice to infer confusing similarity).

(7) *whether non-competing goods are sold in same channels of trade through same media:*

and

(8) *extent to which the targets of the parties' sales efforts are the same:*

In the particular circumstances. of this case, these two considerations may profitably be discussed together, as they are intimately related.

It is clear that these two products do not *directly* compete in the sense that sales of one will displace sales of the other. A mark may, however, be protected in a non-competing market. *Scott*, 589 F.2d at 1225. While true, as defendants contend, that it is ridiculous to suggest someone desiring to buy an arcade machine will be misled into buying one of defendants' products, that is not the issue here. Rather, the concern in the instant case is that purchasers of defendants' games may be confused as to the source of their origin, i.e., may believe that they are made by the same entity which manufactures the arcade game. In this connection, the *purchaser* of the arcade game (i.e., the arcade operator) is *not* the relevant party. Rather it is the *user* of the arcade machine—the person *playing* the game—whose confusion as to the source of origin of the handheld games is at issue. *See* Clarke Declaration, ¶ 15 (there is considerable overlap between market for handheld and arcade machines; it was this overlap in user population that convinced Coleco to enter handheld market). It is the *user* of the arcade machines to whom Bandai is clearly attempting to sell its Galaxian. Defendants' brief at p. 20. Midway is attempting to sell its product to the arcade owners, but it hopes that it will be accepted by arcade users. Indeed, acceptance by arcade users is the single most important factor in an arcade owner's choice of a game. This fact is attested to by detailed information regarding the earning power of the most popular games which appears in trade journals. Thus, the fact that different channels of trade and advertising are employed is irrelevant since, although the *purchasers* of the games are different, the *users* are not.[48] In this case, it is the user of the arcade machines—who "leases" them in one context and "purchases" them in another—upon whom inquiry must focus. Indeed, if anything, the arcade machines provide *de facto* advertising for the handheld units. The different modes of video game use on the part of the same user population account for the lack of similarity in channels of trade and advertising while simultaneously rendering it irrelevant.

(9) *relationship of goods in public's mind because of similarity of function :*

There can be no contention that the two Galaxian games do not provide a similar leisure function and evince a similar mode of operation. Indeed, through packaging and advertising, each of the handheld units vies with the others to establish in the buyer's mind that it is the most like an arcade game. Defendants' game is no exception, proclaiming that it is a replica of the most popular arcade games.

(10) *other facts suggesting that public might expect prior owner to manufacture a product in defendants' market:*

In general, there has been a tremendous boom in the non-arcade video market over the past few years with various popular arcade games being translated into handheld or home video units. This constant feverish production of non-arcade embodiments of video games provides some support for an expectation on the part of the public that the producer of such a popular arcade game as Galaxian would come out with a handheld unit.

The facts underlying the discussion above are simple and before the court in the form of the games themselves and a rudimentary

---

**48.** It is worthy of note that the arcade games in essence "sell" themselves to the consumer of arcade services. One interested in playing arcade games seeks them out in their increasingly more ubiquitous dens; it is the person actually in the *arcade* to whom Midway's "advertising" efforts—through gaudy cabinet decorations and the attract mode giving a free sample of the game's play—are directed.

knowledge of the video game industry's workings, acquired from this case itself. Defendants have not and cannot challenge the factual basis of the foregoing discussion. Examination of the above considerations, and in particular the identity of the marks and Bandai's intent in adopting its mark, makes clear that on these facts, a likelihood of confusion has overwhelmingly been established as a matter of law. *See Johnson & Johnson v. Diaz*, 339 F.Supp. 60, 63 (C.D.Cal.1971) (summary judgment appropriate where no substantial factual question presented and ample basis provided for finding of trademark infringement); *Bowmar Instrument Corp. v. Continental Microsystems, Inc.*, 497 F.Supp. 947, 954–57 (S.D. N.Y.1980) (summary judgment appropriate in trademark/§ 1125(a) case where no genuine issue of fact).

(B) *Packri Monster*: Unlike the "Galaxian" trademark, the Packri Monster mark is not identical to the Pac-Man mark. Thus, there is absent in this claim the "great likelihood of confusion" the Third Circuit attributes to use of an identical mark. *U. S. Jaycees*, 639 F.2d at 142. In addition, defendants have raised the factual issue of abandonment of the mark on the part of Midway. Material fact issues thus preclude the grant of summary judgment for plaintiff. This denial is without prejudice to plaintiff's right to renew its motion at trial.

## VI. *Liability of Japanese Defendants*

There remain only the questions under copyright law of the liability of the two Japanese corporate defendants as contributing infringers and under copyright and trademark law as vicarious infringers. Since no final adjudication of the copyright claims has been made, the question of these defendants' copyright liability *vel non* is premature.

Furthermore, it is clear that the vicarious infringement issues are inextricably bound up in the question of the relationship among the three Bandai defendants.[49] This question presumably also goes to the issue of this court's *in personam* jurisdiction over the Japanese defendants. These defendants have denied this court's jurisdiction in their answer. In the interests of efficiency and of providing defendants a full opportunity to raise their *in personam* jurisdiction objections, adjudication of the vicarious liability of the Japanese defendants will be deferred until they make a motion to challenge *in personam* jurisdiction. This court will set a date for such a motion since presumably all the facts defendants would rely on are already in their possession.

The foregoing opinion constitutes this court's resolution of the summary judgment and preliminary injunction motions brought before it by plaintiff Midway. Plaintiff shall submit a form of order as to the summary judgment granted it on the Galaxian trademark claim and as to the issues withdrawn from the case as per F.R.Civ.P. 56(d). Consent to the form of order, if possible, shall be within 10 days.

49. *See* 3 Nimmer § 12.04[A], p. 12–40–41.