**DON POST STUDIOS, INC., et al., Plaintiffs,**

v.

**CINEMA SECRETS, INC., Defendant.**

**Civil Action No. 99–5731.**

United States District Court,
E.D. Pennsylvania.

Dec. 1, 2000.

Steven L. Friedman, Dilworth, Paxson, LLP, Philadelphia, PA, Evelyn H. Mc Conathy, Dilworth Paxson, Philadelphia, PA, for Don Post Studios, Inc., The Paper Magic Group, Inc.

Karol A. Kepchar, Panitch, Schwarze, Jacobs & Nadel, Philadelphia, PA, Ronald L. Panitch, Panitch, Schwarze, Jacobs and Nadel, Philadelphia, PA, John E. Kelly, Kelly Bauersfeld Lowry & Kelley, Woodland Hills, CA, Ernest E. Price, Ropers, Majeski, Kohn & Bentley, Los Angeles, CA, Brett M. Middleton, Ropers, Majeski, Kohn & Bentley, Los Angeles, CA, Diane E. Brehm, Akin, Gump, Strauss, Hauer & Feld, LLP, Philadelphia, PA, for Cinema Secrets, Inc.

## AMENDED MEMORANDUM *

EDUARDO C. ROBRENO, District Judge.

### I.  Introduction

John Carpenter's 1978 motion picture, *Halloween*,[1] depicts a deranged serial killer named Michael Myers wearing an all white mask who terrorizes a small midwestern town on Halloween night. The popularity of the film and its progeny have spawned a demand for masks resembling the one worn by the fictional character in the movie. The instant case involves a dispute over the origin and authenticity of competing masks bearing a resemblance to the one worn by the character Michael Myers in the movie.

The prototype of the mask worn by the Michael Myers character was created by plaintiff, Don Post Studios,[2] at the request of the *Halloween* filmmakers. At the time that Don Post Studios created and delivered the mask prototype, it did not claim nor did it reserve any rights to the mask worn by the character Michael Myers in the movie.

In 1986, Don Post Studios began marketing a mask called "Don Post the Mask" ("DPTM"). DPTM bears a strong resemblance to the mask worn by the character

---

\* This Amended Memorandum replaces the Memorandum issued on October 31, 2000. The purpose of the amendments is to clarify the legal difference in the terms "copyright" and "copyright registration." To that end, an additional footnote has been included, *see infra* note 3 and accompanying text, and minor editing changes have been made. In all other respects, the memorandum is unchanged.

1. *Halloween* (Compass Int'l Pictures, Inc. 1978) ("On a black and unholy Halloween night years ago, little Michael Myers brutally slaughtered his sister in cold blood. But for the last fifteen years, town residents have rested easy, knowing that he was safely locked away in a mental hospital ... until tonight. Tonight, Michael returns to the same quiet neighborhood to relive his grisly murder again ... and again ... and again. For this is a night of evil. Tonight is Halloween!"). *See* Def.'s Ex. 64 (text on the jacket of a videotape of *Halloween* ).

2. The other plaintiff to this action is The Paper Magic Group, Inc., Don Post Studios' parent corporation.

Michael Myers in the movie. Don Post Studios did not obtain a copyright registration [3] to DPTM until 1998.

In 1999, defendant Cinema Secrets obtained a non-exclusive license from the *Halloween* filmmaker to begin producing a "Michael Myers" mask. Defendant's Michael Myers mask purports to be a copy of the mask worn by the character Michael Myers in the movie. This Michael Myers mask and DPTM bear a striking resemblance to each other.

Don Post Studios alleges that defendant's Michael Myers mask is a copy, not of the mask worn by Michael Myers in the movie, but rather of DPTM. To the contrary, Cinema Secrets contends that it is DPTM that is a copy of the mask worn by the character Michael Myers. The ultimate factual issue is who copied which mask from whom and, if so, when did the copying take place.

Don Post Studios contends that Cinema Secrets' actions constitute copyright and trade dress infringement in violation of § 106 of the Copyright Act and § 43(a) of the Lanham Act. On the other hand, Cinema Secrets argues that Don Post Studio's claim to a copyright is invalid for two reasons: (1) Don Post Studios misled the Copyright Office about the origins of DPTM; and (2) DPTM lacks the originality required for a mask to be copyrightable. In addition, Cinema Secrets contends that, even assuming that the copyright for DPTM is valid, the Michael Myers mask was the result of an independent creation. Finally, defendants argue that there is no trade dress infringement because DPTM has not acquired secondary meaning and it is functional.

With the consent of the parties, the court held a consolidated hearing under Federal Rules of Civil Procedure 65(a)(2) on plaintiffs' request for injunctive relief.[4] Issues of damages were bifurcated to a later date. For the reasons that follow, the court finds that DPTM is a copy of the original prototype worn by the character Michael Myers in *Halloween* and therefore that Don Post Studios does not own a valid copyright to DPTM. Second, even if Don Post Studios held a valid copyright, the court finds that the defendant's conduct did not violate the law because Cinema Secret's Michael Myers mask was an independent creation. Finally, the court finds that plaintiff's trade dress infringement claim fails because DPTM has not acquired secondary meaning.

## II. FACTS [5]

During preproduction of the 1978 film *Halloween*, representatives of the film asked Don Post Studios to create a mask for use by the lead character in the movie, a deranged serial killer named Michael Myers who attacks his victims with a knife on Halloween night. Don Post Studios was at the time in the business of providing special effects and masks to the film industry as well as manufacturing latex rubber masks. *See* Post Dep. at 24–27.

The *Halloween* representative instructed Don Post, head of Don Post Studios, to modify a mask of Captain Kirk, the character featured in the television series Star Trek played by William Shatner, which Don Post Studios had previously created.

---

3. A copyright in a work is created at the same instant that the work itself is created. *See* 2 Melville B. Nimmer and David Nimmer, *Nimmer on Copyright* § 7.16[A][1] (2000). Therefore, a party need not register its copyright with the Copyright Office in order to receive copyright protection. *See id.* As a general rule, however, a party must apply for copyright registration in order to bring an action for copyright infringement. *See id.* · at § 7.16[B][1][a].

4. On February 9, 2000, plaintiff filed a request for a temporary restraining order. *See* doc. no. 3. The court held a hearing on notice to defendant but defendant failed to appear. Based upon the proffer offered by plaintiffs, the court granted the temporary restraining order. *See* doc. no. 6.

5. Pursuant to Fed R. Civ. P. 52(a), this memorandum constitutes the court's findings of fact and conclusions of law.

*See* Post Dep. at 134–35. The Captain Kirk mask is based on a foam master owned by Don Post Studios of Shatner's head. Don Post Studios modified the Captain Kirk mask as per the film representative's instructions and delivered it to the filmmakers. In return, Don Post Studios was paid $150.00 for its work on the mask. Don Post Studios did not assert, nor did it reserve any rights to the mask at that time. It was this modified Captain Kirk mask that was worn by the character Michael Myers in *Halloween.*

In 1981, three years after the original *Halloween* film was released, Don Post Studios requested but was not granted a license from the filmmakers to market the Michael Myers mask. *See* Def.'s Ex. 26.

In 1985, Don Post Studios began work on DPTM. According to Don Post, the concept of the mask was that of a face with blank, expressionless features that would represent "Every" man. To effectuate this project, Don Post hired sculptor Neil Surges. *See* Post Dep. at 165. Post provided Surges with the same foam master which had been used to create the Captain Kirk mask.[6] Post told Surges to reproduce the foam master in a sculpture so that DPTM could be mass produced. *See* Post Dep. at 168–69. Some time around the conclusion of the project, Surges made an entry in a calendar that read "finish Wiliam [sic] Shatner bust," *see* Def.'s Ex 69, and took a picture of the foam master, *see* Def.'s Ex 57.

In 1986, Don Post Studios began producing and marketing DPTM. It is undisputed that DPTM has become a commercial success. Originally, the skin color of DPTM was a flesh tone. One year later, however, the skin color was changed to its present white tone.

In 1997, Don Post Studios attempted to obtain a copyright registration for DPTM. To do so, it retained the law firm of Berman, Berkley & Lasky to prepare the application to the Copyright Office. Melissa Calhoon, Esq., a lawyer at the firm, was assigned to conduct an investigation into the origins of DPTM. During the process of interviewing Don Post Studios employees, Calhoon was provided with a Captain Kirk mask, a copy of the mask that was used in the *Halloween* movie, and DPTM. *See* Calhoon Dep. at 16. Based on her investigation, Calhoon submitted an application to the Copyright Office describing DPTM as a derivative work of a "pre-existing mask with different facial coloration, hair, and eyes." Def.'s Ex. 56. The Copyright Office rejected the application.

In 1997, Don Post Studios engaged Neil Boorstyn, Esq. to prepare a second application to the Copyright Office to obtain a copyright registration for DPTM. Boorstyn's investigation consisted of interviewing Don Post.[7] *See* Boorstyn Dep. at 23. Post told Boorstyn that he alone was responsible for creating the concept of DPTM. *See id.* Based on this representation, Boorstyn filed a second application with the Copyright Office asserting that DPTM was an original creation. *See id.* This second application did not make any reference to the *Halloween* movie mask or the Captain Kirk mask, or to the first application previously rejected by the Copyright Office. *See* Def.'s Ex. 30. Based on representations contained in the second application, the Copyright Office granted Don Post Studios a copyright registration for DPTM.

In 1999, Cinema Secrets entered into a non-exclusive licensing agreement with the

---

6. Don Post admits giving Surges the materials with which to create the sculpture, but vehemently denies that he gave Surges the foam master of William Shatner. The court's basis for its finding of fact that Post did indeed give Surges the foam master of William Shatner is contained in Section V(A)(1)(a), *infra.*

7. Boorstyn did interview William Atcheson, President and CEO of Party Professionals Inc., Don Post Studios' parent corporation. Atcheson was unfamilar with the creation of DPTM and told Boorstyn to discuss DPTM's creation with Don Post. *See* Boorstyn Dep. at 23.

holder of the *Halloween* copyright to produce and market a Michael Myers mask based upon the Michael Myers character in the movie. *See* Pls.' Ex. 7. Cinema Secrets hired Chris Hanson, a sculptor, to effectuate the project. *See* Pls.' Ex. 29. Hanson was given three smaller sized pictures of the mask as it appeared in the movie and a videotape of the movie. *See* Yablans Dep. at 74. The final version of the mask created by Hanson was approved for accuracy by Mickey Yablans, the movie's licensing agent.[8] *See id.* at 66.

In the summer of 1999, Cinema Secrets began marketing its Michael Myers mask. In the fall of 1999, Don Post Studios filed the instant lawsuit, alleging that Cinema Secrets' Michael Myers mask was a copy of DPTM.

## III. DISCUSSION

### A. *The Copyright Claim Fails Because the Copyright Is Invalid and Defendant Independently Created Its Michael Myers Mask.*

To prove copyright infringement, plaintiff must prove (1) ownership of a valid copyright; and (2) copying by the alleged infringer. *Whimsicality, Inc. v. Rubie's Costume Co. Inc.,* 891 F.2d 452, 455 (2d Cir.1989). Plaintiffs' claim fails for two reasons: (1) plaintiffs do not have a valid copyright; and (2) defendant created its product independently of plaintiffs' product and thus plaintiffs cannot prove infringement.

### 1. *The Copyright Is Invalid.*

The Copyright Office granted Don Post Studios a copyright registration in DPTM effective February 18, 1998. *See* Def.'s Ex. 9. A plaintiff in a copyright infringement action must prove, however, that the copyright upon which it rests its claims is valid. *See Raquel v. Education Manage-*

*ment Corp.,* 196 F.3d 171, 182 (3d Cir. 1999) (affirming a district court's finding that plaintiff's registration was invalid). Under 17 U.S.C. § 410(c), only works that are registered within five years after the first publication of the work are entitled to a presumption of validity. For works registered after the five year period following publication, it is within the court's discretion to determine what evidentiary weight the registration should be accorded. *See* 17 U.S.C. § 410(c); *Masquerade Novelty,* 912 F.2d at 667.

In this case, DPTM was registered in 1998, and according to plaintiffs' copyright application DPTM was first published on December 15, 1986. Therefore, the subject work was registered well after the five year period following first publication had expired. Because the copyright registration was obtained more than five years after DPTM was first published, the court may exercise its own discretion in determining the evidentiary weight of the registration. The court finds, however, that even if plaintiffs are accorded the full presumptive weight of a timely registration, defendant has still shown that plaintiffs copied DPTM from a prior source.

█ A defendant may rebut the presumed validity of plaintiffs' registration by showing that the subject of the copyright lacks originality. *See Midway Mfg. Co. v. Bandai–America, Inc.,* 546 F.Supp. 125, 140 (D.N.J.1982). A lack of originality can be shown through either direct proof of copying or by showing that defendant had access to the registered work and that the allegedly infringing work is substantially similar to the registered work. *See id.* The analysis of this case turns on evidence of direct proof of copying, and thus the court will not consider whether defendant has shown access and substantial similarity.

8. Yablans stated that he took an active role in the creation of Cinema Secrets' Michael Myers mask, visiting Cinema Secrets' lab at least three times in order "to make [the mask] look as hundred percent [sic] close to that movie [*Halloween*] as possible." Yablans Dep. at 64. Yablans was apparently dissatisfied with licensed versions of the Michael Myers mask previously marketed by other companies.

### a. Direct Proof of Copying.

In this case, there is ample evidence that DPTM lacks originality because DPTM is a copy of the mask that appeared in the movie *Halloween.*

In the first place, both the original Michael Myers mask worn by the Halloween movie character and DPTM are derived from the same foam master of the head of William Shatner. The testimony of both the sculptor of DPTM and the lawyer who unsuccessfully sought to obtain a copyright registration for DPTM supports this conclusion.

Neil Surges is a free lance sculptor who from time to time had done work for Don Post Studios. Surges testified that in 1985, Don Post asked him to create a sculpture using a foam master given to Surges by Post. Surges recalls thinking at the time that the foam master looked like the actor William Shatner, whom he recognized from Shatner's film and television appearances. *See* Surges Dep. at 55. When he delivered his completed sculpture to the studio, he asked a Don Post Studios' employee about the foam master's likeness to William Shatner. *See id.* at 111. Surges was told by the employee "that the reason it looked like William Shatner was because the character in the movie *Halloween* was based on a William Shatner life mask or cast." *See id.*

Surges's recollection of the events of fifteen years ago is aided by a 1985 calendar in which he made a roughly contemporaneous entry indicating that he had finished the work on the "Wiliam [sic] Shatner bust." In addition, as part of Surges' practice of keeping a photographic

record of the sculpting projects he had undertaken, *see* Surges Dep. at 60, Surges produced a negative of a photograph of the Shatner bust, which Surges testified that he took at Don Post's studio.[9] *See* Def.'s Ex. 57.

In 1997, Don Post Studios retained the law firm of Berman, Berkley & Lasky to file a copyright application for DPTM. Melissa Calhoon, Esq. was a lawyer with the firm at that time. Calhoon was assigned to investigate the origins of DPTM in preparation for the copyright application. As part of the investigation, Calhoon interviewed employees of Don Post Studios who provided her with both the Captain Kirk mask and a version of the mask worn by the character Michael Myers in *Halloween,* as well as DPTM. *See* Calhoon Dep. at 16. Based on her investigation, Calhoon concluded and so represented to the Copyright Office in Don Post Studios' application for a copyright registration that DPTM was a derivative work of a "pre-existing mask with different coloration, hair and eyes." Def.'s Ex. 56.

Don Post denied that he copied DPTM from the mask appearing in *Halloween.* Instead, he contends that DPTM is literally a product of his own head, in that he conceived of the idea for DPTM and gave Surges a sculpting bust of his own head to make a sculpture to be used in mass production of DPTM. According to Post's testimony, DPTM and the mask worn by the Michael Myers character are entirely unrelated. *See* Trial Tr. at 69.

Plaintiffs' assertion that Don Post Studios made no reference to *Halloween* or the Michael Myers character in the cre-

---

**9.** Plaintiffs attempted to impeach the testimony of Surges by suggesting through the testimony of Don Post [but also through direct questioning of Surges] that Surges was unreliable because, at the time he did the work in question, Surges may have been impaired by a dependence on drugs and alcohol. The court has reviewed the entire Surges deposition. It finds Surges to be a witness uninterested in the outcome of the case who had no animus toward Don Post. Although Surges'

recall was understandably less than perfect fifteen years after the fact, he had a clear memory of events described herein. The contemporaneous physical evidence that he provided, the calendar and photographic negative, not only corroborate his testimony but also suggest that Surges was a reasonably organized commercial artist who kept records of his sculpting projects, rather than the chemically impaired dilettante depicted by plaintiffs.

ation of DPTM, *see* Pls.' Revised Proposed Findings of Fact at 4, or in the "selling, promoting, or packaging of [DPTM]," Pls.' Final Mem. of Law in Supp. of Proposed Findings of Facts and Conclusions of Law, at 8, is simply not credible. In the first place, the idea of marketing a Michael Myers-type mask was not new to Post in 1985. He had previously attempted to obtain a license from the makers of the *Halloween* movie to market a Michael Myers mask in 1981, but his request was denied. *See* Def.'s Ex. 26. Moreover, soon after DPTM was first introduced to the marketplace, Don Post Studios marketed DPTM in a manner strongly suggestive of an identification between DPTM and the *Halloween* movie character. In the 1987 Don Post Studios catalog, which features an introduction signed by Mr. Post himself, a model is depicted wearing DPTM and holding a knife in a threatening manner, as if preparing to execute a downward stabbing motion. *See* Def.'s Ex. 33. The choice of weapon, a long knife, and the angle at which the knife is held by the model in the photo is reminiscent of the movie character Michael Myers, who relies on a downward plunging of a knife into his victims to execute the killings.[10] *See* Attach. A (Item No. 924, "The Mask").

To show that DPTM was an original creation, Don Post emphasized that the two masks are substantially dissimilar. According to Post, the mask worn by the

Michael Myers character in the film had black hair and "dirty" white skin, whereas DPTM has brown hair and "clean" white skin. These claims are incorrect,[11] as both the hair and skin color of the mask in *Halloween* and DPTM are virtually identical.

In *Halloween*, it is true that the hair on the mask does appear dark at times.[12] However, in the film's climactic scene, the real color of the hair is revealed. In the scene, the female protagonist, played by Jamie Lee Curtis, attempts to hide in a closet from the pursuing Myers. As Myers breaks through the closet door, a light bulb goes on inside the closet. When Myers sticks his mask-covered head through the opening that he has created in the closet door, the light shines on the mask to reveal that the color of the hair, like DPTM, is brown. Although the hair of the mask in *Halloween* appears to have more of a pompadour-type sweep, both DPTM and the mask appearing in film's hair are combed straight back. In addition, there is no discernable difference in skin color between the mask worn in the film by Michael Myers and DPTM, as the aforementioned scene from *Halloween* that takes place the closet also affords a good view of the "clean" white skin color of the mask as well.[13]

Don Post Studios also contends that the court should disregard the testimony of

10. Not all of the character Michael Myers' victims in the film were killed using a long knife. However, it is clear from watching the film, especially the first scene where a young Michael Myers stabs his older sister with a knife, an event he apparently seeks to recreate by killing other teenage girls through the course of the film, that the knife is the weapon most closely associated with the character Michael Myers. *See* Attach. B.

11. Comparison of DPTM and the mask worn by Michael Myers in *Halloween* is undertaken for the purpose of examining Don Post's credibility, and not to consider substantial similarity between the two masks under the test for substantial similarity as set forth in *Ford Motor Co. v. Summit Motor Prod.*, 930 F.2d 277, 291 (3d Cir.1991).

12. Through much of the film, Michael Myers' features are obscured, apparently for dramatic effect. In those scenes in which Michael Myers does appear, the action is dimly lit or takes places at night.

13. Don Post claims that pursuant to the film representative's instructions he told his employees to paint the hair black and the face "dirty" white. However, the hair color of the mask in *Halloween* was brown and the skin color was "clean" white. There are two plausible explanations for this inconsistency: (1) Post does not properly recall what colors he was told to paint the hair and the face; or (2) the filmmakers themselves modified the hair and skin color. Whether it happened one way or another is immaterial.

Melissa Calhoon. According to Don Post Studios, Calhoon was inexperienced in the subject of obtaining a copyright registration, and, instead, the court should look to the opinion rendered by Neil Boorstyn, Esq., a second lawyer employed by Don Post Studios to prepare the second copyright application. In the second application, Boorstyn concluded, unlike Calhoon, that DPTM was an original, and not a derivative of another work. The court rejects the conclusion reached by Boorstyn because, in reaching it, Boorstyn's investigation consisted solely of interviewing Don Post. Unlike Calhoon, Boorstyn did not interview any employees of Don Post Studios and did not review the William Shatner foam master or the Michael Myers mask. Given that Boorstyn's investigation consisted solely of interviewing Don Post, and that Don Post asserts that DPTM is an original work, it is not surprising that, based on that interview, Boorstyn concluded that DPTM was an original.[14]

Finally, Don Post Studios points out that it originally marketed DPTM with flesh-colored skin and not the ash white-skinned face connected with the *Halloween* character. This argument carries little weight because, within a year of first marketing DPTM, the skin color was changed to white. In any event, at the time that Boorstyn filed the second copyright application, DPTM had been marketed with all-white colored skin for over a decade.

After observing Don Post's demeanor during his testimony at trial, and having considered Surges and Calhoon's testimony, Don Post Studios' unsuccessful licensing effort in 1981, plaintiffs' attempt to evoke an association with the character Michael Myers in its marketing of DPTM, and the similarity between DPTM and the mask worn in *Halloween,* the court finds that the evidence clearly establishes that DPTM is a copy of the mask worn by the character Michael Myers in *Halloween.* Because DPTM is a copy of the Michael Myers *Halloween* mask, DPTM's copyright is invalid.

### 2. Cinema Secrets' Mask Was Independently Created.

■ Cinema Secrets also argues that even if Don Post Studios is found to hold a valid copyright to DPTM, its conduct does not constitute copyright infringement because it created its own mask independently of the copyrighted work, DPTM. Independent creation is a complete defense to a claim of copyright infringement. *See Ford Motor Co.,* 930 F.2d at 295.

At the hearing, Cinema Secrets showed that it had obtained a non-exclusive license from the *Halloween* filmmakers to manufacture and market a Michael Myers mask. In connection with creating this mask, Cinema Secrets hired an independent sculptor named Chris Hanson. *See* Pls.' Ex. 29. Hanson was furnished with three photographs of the character Michael Myers and a videotape copy of the Halloween movie. *See id.;* Yablans Dep. at 74. Daniel Stein, President of Cinema Secrets, testified that Hanson was instructed to make a sculpture with features as close as possi-

---

**14.** Defendant also argues that plaintiffs' copyright is invalid because "a plaintiff's knowing failure to advise the Copyright Office of facts which might have led to the rejection of a registration application constitutes grounds for holding the registration invalid and thus incapable of supporting an infringement action." *Masquerade Novelty, Inc. v. Unique Indus.,* 912 F.2d 663, 667 (3d Cir.1990); *Whimsicality, Inc. v. Rubie's Costume Co., Inc.,* 891 F.2d 452, 456 (2d Cir.1989). There are two issues presented by this argument: (1) what information, if any, did Don Post Studios have a duty to disclose to the Copy-

right Office; and (2) what duty, if any, did Mr. Boorstyn have to investigate further the claims of his client in the face of the first copyright application indicating that DPTM was a derivative work? In other words, in the face of the first investigation did Boorstyn simply bury his head in the sand by accepting Don Post's representation of originality at face value?

Because the resolution of these issues have no bearing on the ultimate resolution of the case, however, the court declines to decide them.

ble to the two dimensional images provided in the photographs and the videotape. *See* Trial Tr. II at 5. The final product created by Hanson was approved for accuracy by Mickey Yablans, the licensing agent for the holder of the Halloween copyright. *See* Yablans Dep. at 64; Trial Tr. at 189.

Don Post did not present any evidence which contradicted Stein's version of how Cinema Secrets' Michael Myers mask was created. Rather, Don Post advances the theory that had Cinema Secrets really wanted to copy the mask worn by Michael Myers in the *Halloween* movie, it would have provided Hanson with blown-up pictures of the movie character that would have allowed Hanson to approximate the facial details of the Michael Myers character to a greater extent. Whether Hanson could have created a better copy of the mask worn by the character Michael Myers than he ultimately did if he had been provided with larger photographs does not negate the fact that the mask he did create was a copy of the mask worn by the character Michael Myers in the film. Accordingly, the court finds that Cinema Secrets' Michael Myers mask was independently created.

B. *The Trade Dress Claim Fails Because DPTM Has Not Acquired Distinctiveness Through Secondary Meaning.*

A plaintiff must establish three elements to prevail on a claim for trade dress infringement: (1) that the trade dress is distinctive based on secondary meaning; (2) that the trade dress is nonfunctional; and (3) that the defendant's use of plaintiff's trade dress is likely to cause consumer confusion. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769–70, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). Defendant contends that plaintiffs' DPTM

has not acquired secondary meaning and is not functional.

To prove acquired secondary meaning, a plaintiff must show that "in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself." *Wal–Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 120 S.Ct. 1339, 1343, 146 L.Ed.2d 182 (2000) (*quoting Inwood Laboratories, Inc. v. Ives Laboratories*, 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982)). In *Funrise Canada (HK) Ltd. v. Zauder Bros., Inc.*, 1999 WL 1021810 (E.D.N.Y.1999), the court faced exactly the same issue of whether a mask had acquired secondary meaning. As in this case, the plaintiff pointed to the features of its masks, including the eyes and color combination and argued that those features were understood by consumers to primarily indicate the manufacturer of the mask. The court in *Funrise Canada* quickly disposed of plaintiff's argument, pointing out the obvious, that "the identified features are aesthetic rather than source-indicative." *Id.* at *12. In addition, the court stated that it "has every reason to believe that the Halloween costume consumer is interested in obtaining a mask that is particularly scary or funny, and not a mask that is produced by Funrise Canada." *Id.*

This same logic applies to this case. Although it is undisputed that consumers like DPTM, plaintiffs produced no evidence that consumers buy the mask because it is Don Post Studios that produces it. Instead, plaintiffs admit that consumers associate the mask with Michael Myers and the mask worn in *Halloween. See* Atcheson Dep. at 35. In addition, some retailers referred to DPTM as "The Michael Myers Mask." *See id.*[15] Therefore, if DPTM has acquired any secondary meaning, it is that DPTM is a "Michael Myers mask." Given that plaintiff can claim no

---

**15.** Out of court statements of consumers describing their motivation for purchasing a particular product are admissible under Fed. R.Evid. 803(3). *See Stelwagon Mfg. Co. v. Tarmac Roofing Sys.*, 63 F.3d 1267, 1274 n.

16 (3d Cir.1995) ("[C]onsumer statements clearly were admissible in this case as evidence of why the customers were not purchasing Tarmac MAPs from Stelwagon....")

rights to the Michael Myers name or image, this secondary meaning does not help plaintiffs' trade dress claim.

Plaintiffs do point to testimony that people within the mask industry, including defendant, were aware that Don Post Studios made DPTM. This evidence says nothing, however, about why consumers buy DPTM to wear on Halloween night. Lacking any evidence demonstrating that DPTM's features are source-indicative rather than aesthetic, *see id.,* the court finds that DPTM has not acquired secondary meaning within § 43(a) of the Lanham Act.

16. The court declines to reach the question of whether masks are functional objects within

Accordingly, plaintiffs' trade dress claim fails because plaintiffs have not shown that DPTM has acquired secondary meaning.[16]

## IV. CONCLUSION

For the reasons stated above, the court finds that plaintiff's copyright in DPTM is invalid because DPTM lacks the requisite originality. The court also finds that defendant created its mask independent of plaintiffs' DPTM. Finally, plaintiffs' trade dress infringement claim fails because DPTM has not acquired secondary meaning.